**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 22, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

VERNON JAMES HILL, a/k/a V,

Defendant – Appellant.

No. 13-5084
(D.C. No. 4:12-CR-00050-JHP-1)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **PHILLIPS**, and **McHUGH**, Circuit Judges.

Vernon Hill[1] was indicted, tried, and convicted of conspiring to rob and robbing banks, credit unions, and pharmacies in Tulsa, Oklahoma. Vernon appeals and argues that the district court erred by: (1) not concluding that his indictment was constitutionally defective; (2) not severing his charges; (3) not

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, claim preclusion, and issue preclusion. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

[1] Throughout this opinion, we will refer to Vernon Hill, Dejuan Hill, Stanley Hill, Deandre Hopkins, and Kenneth Hopkins by their first names because there were other coconspirators indicted with the same last names.

severing his trial from his codefendants' trials;[2] (4) not concluding there was a fatal variance between the charged conspiracy and the individual conspiracies underlying separate robberies; (5) admitting evidence of the robberies charged against his codefendants as well as evidence of the uncharged CVS Pharmacy robbery; (6) admitting gang-affiliation evidence; (7) admitting gang-certification records; (8) admitting the underlying hearsay statements contained within the gang-certification records; (9) admitting cell phone tower records; (10) admitting lay testimony from police officers about cell phone records; and (11) admitting an eyewitness identification in violation of due process. Vernon also argues that cumulative error requires that we vacate his conviction.

Exercising jurisdiction under 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291, we affirm Vernon's convictions for the reasons set forth below.

## I. FACTS AND PROCEDURAL HISTORY

While investigating a series of robberies in Tulsa, the local police began to suspect that the robberies were connected. The police developed a list of suspects, which included Vernon. Other suspects included Dontayne Tiger,

---

[2] Of the eight men charged with the conspiracy, just three—Vernon, Dejuan, and Deandre—were tried together, the remaining five having pleaded guilty before trial.

Deandre Hopkins,[3] James Miller, Christopher Lewis, Marquis Devers, Duncan Herron, and Kenneth Hopkins. Initially, police did not suspect Dejuan Hill, but a grand jury ultimately indicted him as a coconspirator.[4] Officer Maxwell Ryden interviewed Herron, who believed that police would eventually charge him and agreed to cooperate in the investigation.

This appeal involves seven robberies that took place between August 2009 to November 2011: (1) IBC Bank; (2) Dooley's Pharmacy; (3) Barnes Pharmacy; (4) Metro Pharmacy and Medical Supplies ("Metro Pharmacy"); (5) CVS Pharmacy; (6) Tulsa Municipal Employees Federal Credit Union ("Tulsa Credit Union"); and (7) Arvest Bank. The indictment charged that Vernon had participated directly in the robberies of IBC Bank, Metro Pharmacy, and Arvest Bank.

A federal grand jury returned a ten-count indictment against eight men, charging that they had conspired to commit six of the seven robberies, in violation of 18 U.S.C. § 1951(a).[5] The indictment listed 26 overt acts committed

---

[3] Deandre appeals his conviction in a related appeal. *United States v. Hopkins*, No. 13-5072 (10th Cir. May 22, 2015) (unpublished).

[4] Dejuan appeals his conviction in a related appeal. *United States v. Hill*, No. 13-5074 (10th Cir. May 22, 2015).

[5] The indictment named eight defendants: Vernon, Lewis, Deandre, Devers, Tiger, Miller, Kenneth, and Dejuan.

in furtherance of the conspiracy, as well as describing the manner and means of the conspiracy. Vernon filed multiple pretrial motions. Everyone charged in the indictment pleaded guilty except for Vernon, Dejuan, and Deandre. At their joint trial, the government introduced evidence as set forth below.

## A. IBC Bank

In August 2009, a man wearing sunglasses but no mask robbed IBC Bank in Tulsa.[6] At the counter, he spoke with the teller for a few minutes and then demanded money. He told her that he had a gun. The robber left alone on foot.

Tulsa Police Officer John Brown investigated this robbery. Officer Brown showed Officer Amilee Floyd a bank photograph of the robber standing at the teller window. Officer Floyd thought that the person in the photograph was Vernon (Officer Floyd and Vernon had attended high school together). Officer Brown obtained a picture of Vernon, and he showed it to a few witnesses present at the robbery, but no one could identify him as the robber. Officer Brown then

---

[6] Before the trial in this case, a state court jury acquitted Vernon of robbing IBC Bank. The federal jury in this case, however, returned a guilty verdict on Count Two, which charged Vernon with robbing IBC Bank. Count One listed Vernon's robbery of IBC Bank as an overt act done in furtherance of the conspiracy. But we conclude that the government introduced insufficient evidence to tie the IBC Bank robbery to any conspiracy. This conclusion does not affect Vernon's conviction on Count Two for the actual robbery of IBC Bank.

showed the photograph from the robbery to the teller Vernon robbed, Ms. DeLeon, and she identified the man in the photograph as the bank robber. He then showed her a photo array of six similar looking men, and she positively identified Vernon as the bank robber.

At trial, Ms. DeLeon again identified Vernon as the robber. Two other witnesses from the bank robbery also testified that Vernon was the bank robber. Neither of these two witnesses had been able to identify Vernon from the photograph before the trial.

### B. Metro Pharmacy

This robbery occurred in August 2011. Herron testified at trial that he participated in the Metro Pharmacy robbery and described the involvement of Vernon, Lewis, Devers, Tiger, and Deandre. Herron admitted to meeting with these men to plan the Metro Pharmacy robbery. Later that day, they executed their plan. Herron walked into the pharmacy to buy some medicine, texted Devers as he was leaving, and held the door open for Vernon, Lewis, and Devers (because customers had to be buzzed into the pharmacy). Once inside, those three men robbed the pharmacy, and two of the robbers brandished guns, with the third robber (Vernon) carrying a bag. Herron testified that both Tiger and Deandre acted as lookouts during the robbery. After the robbery, the men, except Herron,

got into a van parked outside of the pharmacy and drove away. As Tiger instructed, Herron called 911 to report the robbery after they had left, attempting to divert the police's attention from his involvement.

At trial, the government admitted cell phone records establishing that Devers's phone had called the Metro Pharmacy twice before the robbery, that Devers's phone and Herron's phone had communicated by text message during the robbery, and that Lewis's phone and Vernon's phone had contacted each other by cell phone during the robbery.

## C. Arvest Bank

This robbery occurred in November 2011, and before the trial in this case, a federal jury had already convicted Vernon of committing it.[7] We affirmed his conviction on appeal. *United States v. Hill*, 737 F.3d 683, 689 (10th Cir. 2013). In the present case, the government charged Vernon with having also conspired to commit this offense.[8]

---

[7] This robbery is discussed in depth in *United States v. Hill*, ___ F.3d ___ (10th Cir. 2015), our decision affirming the conviction of Dejuan, who robbed Arvest Bank with Vernon.

[8] To clarify, the Supreme Court has held that a substantive crime and a conspiracy to commit that crime are not the same offense for double jeopardy purposes. *United States v. Felix*, 503 U.S. 378, 391–92 (1992).

Two armed, masked men robbed Arvest Bank. Amidst the money the tellers gave the bank robbers were previously concealed marked $50 bait bills and a strap of $20 bills containing a GPS tracker. When bank employees pull the bait money containing the GPS tracker, this alerts the security company, and the security company calls the bank to check on the situation. Upon the GPS tracker's removal from its magnetic plate, it sent a signal to the police, alerting them of the robbery. After the phones began to ring, Juantonio Baldwin, a bank teller, told the robbers that the security company was calling and that they should leave. The robbers then left the bank.

Officers immediately began receiving location updates from the tracker. The device was moving "pretty fast," so they assumed that it was traveling in an automobile. The tracker stopped moving near 1109 East Pine Street, which was near Vernon's known residence at 1107 East Pine Street. The officers obtained a hand-held tracker, which allowed them to pinpoint exactly where the tracking device was located. They confirmed that it was inside 1107 East Pine. The officers obtained a search warrant for the house. Before they executed the search warrant, Vernon and Stanley Hill (Vernon's brother) emerged from the house, and the officers arrested them. Upon executing the search warrant, the officers found money stolen from the bank, the GPS tracker, a Glock pistol, a hooded black

sweatshirt, a ski mask, gloves, and dark-colored pants, all of which they believed had been used in the robbery.

## D. The Larger Conspiracy

The government's theory of the case at trial was that all eight individuals indicted had conspired, generally, to commit bank, credit union, and pharmacy robberies in Tulsa. To prove this larger conspiracy, the government relied heavily on each coconspirator's relationship with the Hoover Crips street gang. The government also highlighted the perceived similarities between the robberies. At trial, the government introduced evidence of three robberies for which Vernon was not charged—Dooley's Pharmacy, Barnes Pharmacy, and Tulsa Credit Union. No direct evidence linked Vernon to any of those robberies. The government also introduced evidence of a robbery at CVS Pharmacy, a robbery not charged in the indictment. The court admitted evidence tying Vernon to that robbery.

## E. Procedural History

At the conclusion of the government's case, Vernon moved under Fed. R. Crim. P. 29 for a judgment of acquittal on Count One, the global conspiracy charge, arguing that the government had failed to prove interdependence. The district court denied the motion. The jury convicted Vernon on all four charges

against him: one count of conspiracy to commit robbery, two counts of robbery, and one count of using a firearm during and in relation to a crime of violence.

Two weeks after the verdict, Vernon filed another motion for a judgment of acquittal on Count One, this time alleging a fatal variance between his indictment and what the government ultimately proved at trial. Viewing the evidence in the light most favorable to the government, the district court denied the motion, concluding that the government had presented sufficient evidence to establish the global conspiracy.

On appeal, Vernon raises many issues, all of which we discuss in turn below.

## II. THE INDICTMENT

"To pass constitutional muster, an indictment must contain all the essential elements of the charged offense." *United States v. Kovach*, 208 F.3d 1215, 1218 (10th Cir. 2000); *see also United States v. Hathaway*, 318 F.3d 1001, 1009 (10th Cir. 2003). Appellate courts review de novo the sufficiency of an indictment. *Kovach*, 208 F.3d at 1218. "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Bedford*, 536 F.3d 1148, 1156 (10th Cir. 2008) (reviewing for plain error) (quoting *Hathaway*, 318 F.3d at 1009).

On appeal, Vernon argues that his indictment was constitutionally defective because, while the indictment alleged that all of the coconspirators were members or affiliates[9] of the Hoover Crips street gang, "there is no allegation that the Hoover Crips street gang was involved in the conspiracy, or that any Defendant planned any robberies in the capacity of a Hoover Crips leader, member, or associate." Appellant's Br. at 30.

The government argues that the indictment was constitutionally sufficient because it alleged interdependent conduct, even if it did not use the word "interdependent." "Specifically, the indictment alleged that the conspirators were members or affiliates of the Hoover Crips street gang, and described the different roles the conspirators played in the ongoing conspiracy, including meeting to plan the robberies, stealing the vehicles that would be used, acting as lookouts, using cell phones to communicate about the robberies, brandishing and discharging firearms, and demanding money and controlled substances." Appellee's Br. at 36.

Interdependence "exists where coconspirators 'inten[d] to act together for their shared mutual benefit within the scope of the conspiracy charged.'" *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) (alteration in original)

---

[9] The actual gang-certification records use the word "associate," but the parties use the word "affiliate" to describe someone who has a relationship with the Hoover Crips but is not a member. We will use the word "affiliate" throughout this opinion for consistency with the parties' usage.

(quoting *United States v. Evans*, 970 F.2d 663, 671 (10th Cir. 1992)). In *Bedford*, we evaluated whether the indictment in that case sufficiently alleged interdependence. 536 F.3d at 1156–57. We held that "while not using the label interdependent, the indictment described the interdependent behavior of the coconspirators in the sections entitled 'Manner and Means of the Conspiracy' and 'Overt Acts.' Thus, the indictment sufficiently charged [the] Defendant with the elements of conspiracy." *Id.* at 1157 (citation omitted).

Here, the indictment alleged that "[i]t was part of the conspiracy that the conspirators were and are members or affiliates with the Hoover Crips street gang." It went on to list the specific actions each defendant completed in furtherance of the conspiracy. For example, the indictment alleged that the members met to plan the robberies, stole vehicles to commit the robberies, and met to divide the stolen goods from the robberies. While it did not use the word "interdependent," the indictment alleged specific interdependent behavior throughout the "Overt Acts" section.

We think that Vernon's indictment was constitutionally sufficient. Our conclusion here is best demonstrated by comparing *United States v. Prentiss*, 273 F.3d 1277, 1283–84 (10th Cir. 2001), where we vacated the defendant's conviction for arson, with *Bedford*, 536 F.3d at 1156–57 (affirming the sufficiency of the defendant's conspiracy indictment). In *Prentiss*, the uncharged

element was that either the victim or the defendant was a Native American, which was not mentioned in the indictment, 273 F.3d at 1278; in *Bedford*, by contrast, the indictment listed specific behavior establishing interdependence for the conspiracy but did not mention the element expressly, 536 F.3d at 1156–57. We nonetheless concluded that the indictment in *Bedford* was constitutionally sufficient. 536 F.3d at 1157. The indictment in *Prentiss*, conversely, was constitutionally defective. 273 F.3d at 1283–84.

We think that Vernon's indictment is akin to *Bedford*, not *Prentiss*. The indictment described the coconspirators' alleged interdependent actions.[10] It put Vernon on notice of the charges against which he had to defend and enabled him to assert a double-jeopardy defense. Vernon's indictment was constitutionally sufficient. We affirm the district court.

### III. MOTIONS TO SEVER

We next consider Vernon's argument regarding his unsuccessful motion to sever. We review the denial of a motion to sever for an abuse of discretion. *Evans*, 970 F.2d at 675. We will not reverse absent a strong showing of prejudice.

---

[10] Whether the indictment sufficiently alleged interdependence is a distinct question from whether there was sufficient evidence to prove it. For instance, the indictment alleged that the coconspirators had operated together as members of the Hoover Crips street gang. At the indictment stage, this adequately alleged interdependence. But as we conclude below, the gang evidence introduced at trial was insufficient to establish interdependence for the global conspiracy.

*Id.* "Neither a mere allegation that [the] defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' [of damaging evidence] is sufficient to warrant severance." *United States v. Edwards*, 69 F.3d 419, 434 (10th Cir. 1995) (second alteration in original) (quoting *United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992)). In a conspiracy trial, we presume that persons charged together should be tried together. *United States v. Stiger*, 413 F.3d 1185, 1197 (10th Cir. 2005); *Edwards*, 69 F.3d at 434. Further, joinder of a conspiracy count in the same indictment and trial as the underlying substantive offenses is proper under Fed R. Crim. P. 8(a). *United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002).

Under Fed. R. Crim. P. 14, Vernon filed a pretrial motion to sever his charged offenses into two trials and to sever his trial from the other defendants.[11] Vernon attempted to show the necessary prejudice under Rule 14 by identifying certain coconspirator statements that, if introduced at trial, would prejudice him. Taking its cue from Rule 14(b),[12] the district court required the government to deliver to

---

[11] Specifically, Vernon asked the district court to sever and try separately Count Two, which related to the IBC robbery. Vernon also requested the district court to sever Counts Five and Six, which involved the robbery committed by Vernon, Lewis, Deandre, Devers, and Tiger.

[12] This rule requires that "[b]efore ruling on a defendant's motion to sever, the court may order a government attorney to deliver to the court for in camera

- 13 -

the court for in camera inspection any coconspirator statements it intended to use at trial. After reviewing that evidence, the district court excluded one of Vernon's coconspirator's statements, concluding it was inadmissible under Fed. R. Evid. 801(d)(2)(E) because it was not uttered during and in furtherance of the conspiracy. The district court denied the severance motions.[13]

---

inspection any defendant's statement that the government intends to use as evidence." Fed. R. Crim. P. 14(b).

[13] The court explained:

> Based upon the evidence presented by the government, this court finds that the government did not present independent admissible evidence of a conspiracy. During said hearing numerous statements were identified as having been made by one or more of the defendants. According to the government's summation of the evidence, however, the only statements which the government will seek to admit as co-conspirators statements were made by Defendant Devers to Duncan Herron. Since the government's evidence failed to prove a conspiracy, this court finds said statements are not admissible under Fed. R. Evid. 801(d)(2)(E).

R. vol. 1, at 448. Vernon points to this statement in support of his argument that the trials and charges should have been severed because the government failed to properly indict or prove a conspiracy. In equating a preliminary finding of conspiracy enabling the government to introduce coconspirator statements under Rule 801(d)(2)(E) with the sufficiency of a conspiracy charge in an indictment, Vernon errs. *See generally United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir. 1994) (noting that the defendant's contention that the district court erred in denying his motion for judgment of acquittal "amount[ed] to a simple hearsay objection") ("The strongly preferred order of proof in determining the admissibility of an alleged coconspirator statement is first to hold a [hearing] . . . outside the presence of the jury to determine by a preponderance of the evidence the existence of a predicate conspiracy.").

To this court, Vernon makes a slightly different argument under Fed. R. Crim. P. 8(b), asserting that the claims against Vernon had to be severed from unrelated charges against codefendants. He confuses the issues: Rule 8 is a permissive rule that allows courts to join defendants and charges under certain circumstances; Rule 14 provides relief from prejudicial joinder. Vernon admits that if the indictment had properly alleged a global conspiracy, then the district court could properly join the counts under Rule 8.

Fed. R. Crim. P. 8(a) governs the joinder of offenses: the indictment may charge a defendant "with [two] or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(b) governs the joinder of defendants: the indictment "may charge [two] or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." We construe Rule 8 broadly to "allow liberal joinder to enhance the efficiency of the judicial system." *United States v. Jones*, 530 F.3d 1292, 1298 (10th Cir. 2008) (quoting *United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997)).

We do not think that the trial court erred in denying either severance motion. First, joinder of offenses was proper under Fed. R. Crim. P. 8(a) because the individual robberies were alleged as the overt acts establishing the conspiracy. Second, the district court properly joined the defendants' trials under Fed. R. Crim. P. 8(b) because the defendants were charged together as coconspirators.[14]

Finally, Vernon makes no argument regarding any resulting prejudice. At most, he argues that he "was forced to defend himself in a trial that involved presentation of gang evidence and evidence regarding three robberies the government concedes he did not commit." Appellant's Br. at 32. Under *Edwards*, this is insufficient to establish prejudice. *See* 69 F.3d at 434. While Vernon broadly alleges prejudice, he does not point to any specific instances in his trial where prejudice occurred. This broad contention is insufficient.[15] *See United States v. Pursley*, 474 F.3d 757, 766 (10th Cir. 2007) ("To establish prejudice, a defendant must point to a 'specific trial right' that was compromised or show the jury was 'prevent[ed] . . . from making a reliable judgment about guilt or

---

[14] We note that our conclusion here does not change because we later conclude that the government failed to prove the global conspiracy. At the time of the district court's order, the district court had properly joined the charges and trials.

[15] For example, if two defendants intend to present antagonistic defenses, a district court can conclude that the joinder of their trials would prejudice the defendants. *See, e.g.*, *United States v. Pursley*, 474 F.3d 757, 765–66 (10th Cir. 2007).

innocence.'") (alterations in original) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

We affirm the district court's denial of the severance motions.

## IV. VARIANCE

Next, Vernon argues that the government failed to prove the global conspiracy charged in Count One. To prove a conspiracy, the government must prove four elements: (1) that two or more people agreed to violate the law; (2) that the defendant knew at least the conspiracy's essential objectives; (3) that the defendant knowingly became a part of the conspiracy; and (4) that the coconspirators were interdependent. *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007). Vernon disputes only whether the government introduced enough evidence to establish the fourth element, interdependence—and if it did not, whether its failure to introduce sufficient evidence constitutes a fatal variance.

"We treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008) (quoting *United States v. Griffin*, 493 F.3d 856, 862 (7th Cir. 2007)). We review de novo challenges to the sufficiency of the evidence. *United States v.*

*Wells*, 739 F.3d 511, 525 (10th Cir. 2014). We must take the evidence and draw all reasonable inferences in favor of the government. *Id.* "Distinguishing between a single, large conspiracy and several smaller conspiracies is often difficult; we will generally defer to the jury's determination of the matter." *Caldwell*, 589 F.3d at 1329. The existence of a variance that would support acquittal is a legal question also reviewed de novo. *Id.* at 1328, 1333.

Interdependence is the focal point for determining whether a single conspiracy existed, and it "exists where coconspirators 'inten[d] to act together for their shared mutual benefit within the scope of the conspiracy charged.'" *Id.* at 1329 (alteration in original) (quoting *Evans*, 970 F.2d at 671). "[I]nterdependence exists where each [coconspirator's] activities constituted essential and integral steps toward the realization of a common, illicit goal." *Edwards*, 69 F.3d at 431 (quoting *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990)) (internal quotations omitted). It requires that all coconspirators have a single criminal objective, not just similar or parallel objectives between similarly situated people. *Evans*, 970 F.2d at 670. We must evaluate "what kind of agreement or understanding existed as to each defendant." *United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989) (quoting *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964)). Circumstantial evidence can often prove this. *United States v. Hutchinson*, 573 F.3d 1011, 1035 (10th Cir. 2009).

A "variance arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple conspiracies." *Carnagie*, 533 F.3d at 1237 (citing *United States v. Ailsworth*, 138 F.3d 843, 848 (10th Cir. 1998)). The prohibition against variances is intended to protect the fairness of the defendant's trial. *See generally* Wayne R. LaFave et al., 5 Crim. Proc. § 19.6(b) (3d ed. 2014) (discussing the origin of the prohibition against variances from *Berger v. United States*, 295 U.S. 78 (1935), and the policy justifications for the rule). A variance constitutes reversible error only if it affects the substantial rights of the defendant. *Edwards*, 69 F.3d at 433; *see also Caldwell*, 589 F.3d at 1333.

We explained in *United States v. Harrison* that "[a] defendant's substantial rights are not prejudiced merely because the 'defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment.'" 942 F.2d 751, 758 (10th Cir. 1991) (quoting *United States v. Mobile Materials*, 881 F.2d 866, 874 (10th Cir. 1989)); *see also Carnagie*, 533 F.3d at 1241 ("When a narrower scheme than the one alleged is fully included within the indictment and proved, we have repeatedly held that a defendant's substantial rights are not prejudiced."). A variance can be prejudicial by either failing to put the defendant on sufficient notice of the charges against him, *United States v.*

*Windrix*, 405 F.3d 1146, 1154 (10th Cir. 2005), or by causing the jury to determine the defendant's guilt by relying on evidence presented against other defendants who were involved in separate conspiracies (the so-called "spillover effect"), *Edwards*, 69 F.3d at 433. When deciding whether a prejudicial guilt-spillover occurred, we consider (1) whether the separate conspiracies affected the jury's ability to evaluate each defendant's individual actions, (2) whether the variance caused the jury to misuse evidence, and (3) the strength of the evidence underlying the conviction. *Carnagie*, 533 F.3d at 1241.

In this case, in Count One, the government charged the defendants, including Vernon, with conspiring to rob banks, credit unions, and pharmacies throughout Tulsa as members or affiliates of the Hoover Crips. The government listed the following manner and means of the conspiracy: (1) "[T]he conspirators were and are members or affiliates with the Hoover Crips street gang"; (2) "[T]he conspirators would and did commit robberies of businesses, including pharmacies, banks and a credit union"; (3) "[T]he conspirators would and did use firearms during the robberies"; (4) "[T]he conspirators would and did use cellular phones to communicate before, during and after robberies"; and (5) "[T]he conspirators would and did threaten persons who were potential witnesses to robberies." Count One listed 26 overt acts that various conspirators allegedly

took in furtherance of the conspiracy. These overt acts included six robberies charged directly against various combinations of the charged conspirators.

In Vernon's pretrial motion to dismiss Count One of the indictment, he argued that there was a fatal variance between the indictment and the evidence proved at trial. He argued that the indictment alleged a global conspiracy, but that the evidence would show only multiple, smaller conspiracies. The district court denied this motion, but it advised Vernon that he could "reurge this motion after all of the evidence has been presented at trial." The government's theory at trial was that Vernon and his coconspirators were members of the Hoover Crips, and through this association, they had conspired to commit multiple robberies. Vernon argues that this evidence was insufficient to prove interdependence for the global conspiracy.

We agree with Vernon that the record shows insufficient evidence that the charged coconspirators shared a single, shared unlawful goal or purpose of robbing banks, credit unions, and pharmacies as the indictment charged.[16] *See United States v. Daily*, 921 F.2d 994, 1007 (10th Cir. 1990) ("[T]he focal point of the [interdependence] analysis is whether the alleged co-conspirators were united

---

[16] We think that the indictment properly alleged a single, shared unlawful goal or purpose for the global conspiracy, but the evidence at trial instead only established multiple, separate conspiracies. Accordingly, we do not need to address Vernon's argument that if the indictment alleged multiple conspiracies, it was duplicitous.

in a common unlawful goal or purpose."), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995). As we explained in *Carnagie*, "[a] common goal, however, is not by itself enough to establish interdependence: [w]hat is required is a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people." 533 F.3d at 1239 (emphasis in original) (internal quotations omitted) (quoting *Evans*, 970 F.2d at 671). Conspiring to commit one of the individual robberies, without more, does not amount to conspiring to commit all of the robberies. Even though the general objective between the individual robberies was the same—the robbery of banks, credit unions, or pharmacies for drugs or money—that does not necessarily mean that the separate groups were interdependent. *See id.* at 1238–40.

For the global conspiracy, the jury had to infer that because all of the conspirators were members or affiliates of the Hoover Crips, they must have had a shared, criminal objective sufficient to establish interdependence. We do not think that is enough. In *United States v. Robinson*, 978 F.2d 1554, 1563 (10th Cir. 1992), we explained that, while gang-affiliation evidence is probative circumstantial evidence tending to show agreement, purpose, and knowledge for a

conspiracy, gang-affiliation evidence "alone could not support a conviction."[17] The defendants in *Robinson* stood trial for conspiring to distribute, possess, and manufacture cocaine base. *Id.* at 1558. In that case, unlike here, the government admitted evidence beyond gang membership to prove the drug conspiracy. *Id.* at 1563. For instance, there was "uncontroverted testimony that the main purpose of the [gang] was to sell cocaine" and "ample evidence of drug trafficking in addition to the gang related items discovered at the apartment . . . ." *Id.* at 1561–63. For the conspirators in this case, we see no evidence, other than gang membership, that shows or provides a sufficient inference of a shared criminal goal to rob banks and pharmacies.

For instance, there was no evidence showing that the individual robbers "benefitted from or depended upon the success of the" other robbers or robberies. *See Carnagie*, 533 F.3d at 1240 (citing *United States v. Yehling*, 456 F.3d 1236, 1241 (10th Cir. 2006) ("[E]ach coconspirator's actions must facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole.")). There must be at least some evidence of "mutual dependence." *Id.*; *see also Kotteakos v. United States*, 328 U.S. 750, 754–55 (1946). The conspirators' affiliations with the Hoover Crips, by itself, are not enough to establish

_____

[17] We note that the gang-certification evidence introduced at trial only showed that Vernon was a known affiliate of the Hoover Crips, not necessarily a full-fledged member.

- 23 -

interdependence. Lacking from the government's proof was any showing that for any particular robbery, anyone but the robbers committing it benefitted in any way—that is, we see no evidence that nonparticipating gang members or affiliates shared in any stolen drugs or money. In one very real sense, each individual bank, credit union, or pharmacy robbery harmed—not benefitted—the nonparticipating bank robbers. After each robbery, police became more alert to future related robberies and began to see that Hoover Crips members or affiliates were involved.

The government argues that the commonalities between the robberies and the gang evidence should be enough. We disagree. While commonalities might be enough if the means and method were unique in some way, that simply was not the case here. *Cf., e.g.*, *United States v. Carroll*, 207 F.3d 465, 469–70 (8th Cir. 2000) (finding the means and methods used in two bank robberies too generic to permit an inference of identity under Fed. R. Evid. 404(b)). The government tried to rely on the gang-affiliation evidence to link all of these facts together and paint a picture of a gang-based robbery conspiracy. It also cited the discharge of firearms and the demand of money and controlled substances during the robberies in an attempt to prove interdependence. The use of cell phones, facemasks, guns, bags, threats, and a stolen getaway car does not elevate this string of robberies

into one where we can infer that the same group committed all of them. We do not see any uniqueness in method that would support interdependence.

Therefore, we conclude that the government introduced insufficient evidence of interdependence to prove the global conspiracy as Count One charged. But this does not end our inquiry. In this situation, if the government showed that Vernon conspired to commit one or more of the individual robberies, we can still affirm his conspiracy conviction under our circuit's variance doctrine. *See, e.g.*, *Caldwell*, 589 F.3d at 1332–33. This requires us to analyze (1) whether the government proved that Vernon had conspired to commit one or more of the individual robberies, and (2) whether this discrepancy constitutes a prejudicial variance.

In fact, Vernon concedes the first inquiry by admitting that multiple, smaller conspiracies were established:[18]

> At most, a juror could have inferred Vernon robbed a bank by himself, agreed to participate in a conspiracy to rob the Metro (with one group of people), and then engaged in a second conspiracy to rob the Arvest Bank (with his brother or brothers, who were not involved in the other robberies). However, no evidence links those robberies to each other or to some common endeavor.

---

[18] Even had Vernon not conceded this argument, we think sufficient evidence establishes two individual conspiracies. We agree with Vernon that there was insufficient evidence introduced at trial to establish that he conspired to rob IBC Bank. But even excluding the IBC Bank robbery, the evidence at trial still showed two narrower conspiracies—a conspiracy to rob the Metro Pharmacy and a conspiracy to rob the Arvest Bank.

Appellant's Br. at 36. In his Reply Brief, he goes even further: "Vernon does not dispute that each robbery (excluding the IBC robbery) had more than one participant and was planned by its robbers, whoever they were." Appellant's Reply Br. at 7, 9 ("At most, the evidence shows that different people on different dates and locations got together to plan unrelated robberies."). Vernon rests his appeal on the alleged prejudice that resulted from this variance. To determine if Vernon suffered prejudice, we look at whether he received adequate notice of the smaller conspiracies and whether there was prejudicial guilt spillover.

### A. Did Vernon Receive Adequate Notice of the Smaller Conspiracies Actually Proven?

We conclude that the indictment adequately notified Vernon of the smaller conspiracies ultimately presented at trial. *See, e.g.*, *Caldwell*, 589 F.3d at 1333 ("When an indictment charges a conspiracy among multiple individuals, it generally provides sufficient notice to a defendant that she must defend against the smaller conspiracies."). The indictment fully contemplated the smaller conspiracies. Based on the indictment, Vernon knew that the government had charged him with committing two robberies (not including his earlier conviction

for the Arvest Bank robbery). By reading the indictment, Vernon could fully anticipate evidence about the Hoover Crips and his conduct in committing the IBC Bank, Metro Pharmacy, and Arvest Bank robberies. This adequately notified him of his need to defend against the smaller conspiracies ultimately proved.

## B. Was There Prejudicial Guilt Spillover?

Second, "[a] defendant's substantial rights are affected in the context of a variance when the jury determines a defendant's guilt by relying on evidence adduced against coconspirators who were involved in separate conspiracies." *Edwards*, 69 F.3d at 433. To evaluate whether a prejudicial spillover occurred, reviewing courts look to three factors: (1) whether the separate conspiracies affected the jury's ability to evaluate each defendant's individual actions; (2) whether the variance caused the jury to misuse evidence; and (3) the strength of the evidence underlying the conviction. *Carnagie*, 533 F.3d at 1241. Applying these factors, we conclude that there was no spillover-guilt effect in this case.

### i. Did the Separate Conspiracies Affect the Jury's Ability to Evaluate Each Defendant's Individual Actions?

Evaluating the first *Carnagie* factor, we conclude that the evidence of separate conspiracies did not impair the jury's ability to segregate each conspirator's actions. As the Supreme Court explained in *Kotteakos*, the greater number of

defendants tried and conspiracies established, the more likely it is that prejudice will result. 328 U.S. at 772–73. In that case, more than thirty people were indicted, with nineteen tried together, and at least eight separate conspiracies established. *See id* at 766.

The Court created no fixed rule based on the numbers for determining when prejudice occurs. *Id.* at 773–74 (expressing no opinion on what "marks the limit," but making clear that it exists somewhere between *Berger* and *Kotteakos*). Reviewing courts must look to the facts of each case to determine whether a defendant has suffered substantial prejudice. *See generally Carnagie*, 533 F.3d at 1242 (holding that trying three defendants together for three separate conspiracies, given other factors, did not constitute prejudice). In this case, there were only three defendants tried together (Vernon, Dejuan, and Deandre) and five conspiracies proven (Dooley Pharmacy, Barnes Pharmacy, Metro Pharmacy, Tulsa Credit Union, and Arvest Bank). As in *Carnagie*, "the number of defendants tried and conspiracies proven do not reach the magnitude of *Kotteakos*, and thus the risk of prejudice is not as great." *Id.* (citing *Kotteakos*, 328 U.S. at 774).

In support of his argument that he suffered prejudice from evidentiary spillover, Vernon makes three arguments: (1) "the government admitted and highlighted a great deal of evidence about crimes Vernon clearly did not

commit"; (2) "[t]he government also used the Global Conspiracy theory as a justification to present gang evidence at trial"; and (3) "the jury's special interrogatory answers in connection with the verdict against Vernon contained adverse findings about the Dooley Pharmacy, the T. Roy Barnes [Pharmacy], and Tulsa Municipal Employees Credit Union robberies, absent any evidence linking Vernon to those crimes." Appellant's Reply Br. at 16.

Vernon's first argument is unpersuasive. There were very clear distinctions between the evidence that was relevant to each defendant. As in *Carnagie*, the evidence here was not so intricate as to render the jury unable to separate the evidence associated with each defendant's individual actions. *See* 533 F.3d at 1242. Moreover, the evidence from the other robberies was "of the exact same character" as the evidence from the three robberies involving Vernon. *See id.* "We have held that such a similarity between different transactions cuts against a finding of substantial prejudice." *Id.*; *cf. United States v. Bertolotti*, 529 F.2d 149, 157 (2d Cir. 1975) (finding a prejudicial variance based in part on the fact that "the crimes of the various appellants . . . scarcely resembled one another").

Nor does Vernon's second argument persuade us. As we explain below, we conclude that the district court properly admitted gang-affiliation evidence against Vernon under Fed. R. Evid. 403. Its probative value, even in light of the danger of unfair prejudice, would have existed even if Vernon had stood trial for

conspiring to commit the three smaller robberies. The evidence still would have tended to show purpose, knowledge, and intent to commit the three robberies, especially for the Metro Pharmacy robbery, which involved a wider, more diverse group of coconspirators (than the Arvest Bank robbery), who shared ties with each other through the Hoover Crips. Because we conclude that this evidence was admissible under Fed. R. Evid. 403, we also conclude that its admission does not constitute substantial prejudice for the purpose of the variance analysis. Vernon makes no particularized argument regarding why the gang evidence caused him substantial prejudice; he simply asserts that it did.

Evaluating his final argument, we fail to see what "adverse findings" the jury's special interrogatory answers contain. In our view, the special interrogatories show that the jury understood that it could hold each defendant accountable only for the evidence introduced against him.

### ii. Did the Variance Cause the Jury to Misuse Evidence?

Under *Carnagie*'s second prong, we must examine whether a variance caused juror confusion about the legal limitations on the use of certain evidence. 533 F.3d at 1243. Vernon does not allege this type of prejudice. In fact, the district court excluded all coconspirator statements that the government had sought to

introduce under Fed. R. Evid. 801(d)(2)(E). After reviewing the record, we conclude that there was no prejudice from jury confusion.

### iii. Was there Sufficiently Strong Evidence Underlying the Jury's Decision?

Under *Carnagie*'s final prong, we must consider the strength of the evidence underlying the jury's conviction on Count One, the global conspiracy. To do so, we examine the evidence supporting the "smaller, separate conspiracies." *Carnagie*, 533 F.3d at 1243. As first noted earlier, we conclude that the government presented sufficient evidence to prove that Vernon conspired with others to rob Metro Pharmacy and Arvest Bank.

For the Metro Pharmacy robbery, Herron testified that Vernon had planned and participated in the robbery. Herron walked into the pharmacy to buy some medicine, texted Devers as he was leaving, and held open the door for Vernon, Lewis, and Devers because customers had to be buzzed into the pharmacy. Once inside, those three men robbed the pharmacy, and two of the robbers displayed guns, with the third robber (Vernon) carrying a bag. After the robbery, the men, except Herron, got into a van parked outside of the pharmacy and drove away.

For Arvest Bank, the government presented evidence that two armed, masked men robbed it. The tellers gave the robbers previously concealed and marked $50 bait bills and a strap of $20 bills containing a GPS tracker. Officers immediately

began receiving location updates from the tracker. The device stopped moving near 1109 East Pine Street, which was near Vernon's known residence at 1107 East Pine Street. The officers obtained a search warrant for Vernon's house. Before they executed the search warrant, the officers arrested Vernon and Stanley after they emerged from the house. Upon executing the search warrant, the officers found money stolen from the bank, the GPS tracker, a Glock pistol, a hooded black sweatshirt, a ski mask, gloves, and dark-colored pants, all of which they believed had been used in the robbery. This is enough evidence to prove that Vernon was involved in the conspiracy to rob Arvest Bank. That being so, we conclude that Vernon did not suffer prejudice from any guilt transference.

In sum, we conclude that Vernon did not suffer substantial prejudice from the variance. We affirm his conviction on Count One.

## V. INTRINSIC EVIDENCE

Vernon argues next that some evidence the district court admitted as intrinsic to the charged crimes was instead extrinsic. At trial, the government introduced evidence establishing all six charged robberies, including the three involving Vernon (IBC, Metro Pharmacy, and Arvest Bank), and one robbery not charged to anyone (CVS Pharmacy). Under Fed. R. Evid. 404(b), Vernon objected to the court's admitting evidence of any robbery not charged to Vernon as improper

because there was no global conspiracy. The trial court admitted all of the evidence, finding that it was intrinsic evidence, outside the scope of Fed. R. Evid. 404(b), because it was "closely related to the conspiracy charged and [fell] within the relevant time frame."

Vernon argues on appeal that the government presented three extra trials relating to robberies Vernon certainly did not commit. The government responds that the challenged evidence was intrinsic evidence, not subject to Fed. R. Evid. 404(b), because it all was either charged to one of the coconspirators or it took place during the same timeframe as the conspiracy.

Fed. R. Evid. 404(b) applies only to evidence of acts extrinsic to the charged crime. *Record*, 873 F.2d at 1372 n.5. An uncharged act may not be considered extrinsic if it was part of the scheme for which a defendant is being prosecuted, *id.*, or inextricably intertwined with the charged crime such that a witness's testimony would have been confusing and incomplete without mention of the prior act, *United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir. 1994). To be considered intrinsic evidence, rather than extrinsic, "the government's use of evidence of wrongful, uncharged acts [must be] necessary to contextualize" the evidence introduced at trial. *United States v. Hood*, 774 F.3d. 638, 644 (10th Cir. 2014) (concluding that evidence establishing why the police officers were at a particular location qualified as intrinsic evidence, not subject to Fed. R. Evid.

- 33 -

404(b)). We review the trial court's decision to admit evidence for an abuse of discretion. *United States v. Neal*, 718 F.2d 1505, 1509–10 (10th Cir. 1983).

## A. Evidence of the Traffic Stop

First, Vernon appeals the district court's decision to admit evidence of a traffic stop involving Lewis, Eddie Brown, and Patrick Crisp. In an attempt to prove a substantive charge against Deandre for the Credit Union robbery, the government introduced evidence of the traffic stop, which occurred almost a month after that robbery. The evidence showed that during a search of the car, the officers found marijuana, two bottles of codeine cough syrup, and a large amount of cash. The government argued, and the district court agreed, that this evidence helped prove the Credit Union robbery.

We decline to decide whether the district court properly admitted this evidence as intrinsic evidence for the Credit Union robbery because any error was harmless. The admission of this evidence constitutes a nonconstitutional error, so we only decide whether the evidence, in light of the entire record, (1) substantially influenced the outcome of the trial or (2) leaves us in grave doubt as to whether it had such an effect. *Kotteakos*, 328 U.S. at 764–65 (establishing the harmless error rule); *United States v. Tome*, 61 F.3d 1446, 1455 (10th Cir. 1995). The traffic stop did not even involve Vernon, and he makes no

particularized argument as to how this evidence substantially influenced the outcome of his trial. Accordingly, error here, if any, was harmless.

## B. Evidence of the CVS Pharmacy Robbery

Vernon complains that the district court allowed evidence of the uncharged CVS Pharmacy robbery just because it occurred within the timeframe of the conspiracy and was similar to the charged robberies. Separate from his concern over whether this evidence was intrinsic, Vernon argues that the district court erred in admitting this evidence because there was no proof that Vernon was involved in the CVS robbery.

In response, the government contends that this evidence helped establish interdependence by demonstrating the individual robbers' specific roles over the course of multiple robberies. Accordingly, the government argues, the district court did not abuse its discretion in admitting evidence of the CVS robbery as direct evidence of the charged conspiracy.

We disagree with the government. Herron told Officer Ryden that Vernon participated in the Metro Pharmacy robbery. Based on this information from Herron, Officer Ryden compared the video from the Metro Pharmacy robbery to the CVS Pharmacy robbery, attempting to ascertain whether any one person participated in both robberies. Based on the video footage, Officer Ryden thought

that Lewis participated in both because of his physical appearance, his left-handedness, and his use of a firearm in both robberies. He also concluded that Devers participated in both because of his physical appearance and clothing worn in both robberies. Finally, Officer Ryden thought that the third person in both robberies was Vernon because he looked similar in the videos and he carried a bag, not a gun.

During its closing argument, the government discussed the CVS Pharmacy robbery, saying, "Following [the Metro Pharmacy robbery], the CVS store was robbed. And exactly what happens then? They have now learned, thanks to the Metro robbery, you steal a vehicle, you don't leave anything in it." The government then went on to compare the CVS robbery to the other robberies, arguing that Vernon was one of the men in the tape from the CVS robbery.

To admit evidence as intrinsic—and to avoid having to comply with Fed. R. Evid. 404(b)'s requirements—the evidence must provide context for other admissible evidence or witness testimony. The district court explained that "such evidence can be considered intrinsic evidence falling outside of Rule 404(b) usually—and this is where I'm hanging my hat on this—usually when that evidence is closely related to the conspiracy charged and falls within the relevant time frame." The court went on, "I think that describes the evidence that I anticipate the government intends to introduce. . . . I [find] that it is intrinsically

connected to the evidence that's been put on of the other robberies so it comes into evidence under that theory." As such, the court concluded that this evidence fell outside Fed. R. Evid. 404(b)'s scope.

This is not enough. The CVS Pharmacy robbery evidence needed to provide context to other admissible evidence, or more relevant here, it needed to contextualize a witness's testimony. In *Hood*, for example, the only way the officer could explain being at the apartment complex where he encountered Hood was by referring to the burglary investigation. 774 F.3d at 644. If the officer had not mentioned that investigation and background, his testimony about being at the apartment complex would have confused the jury. *Id.* So had Officer Ryden's investigation of the CVS Pharmacy robbery led him to suspect Vernon's involvement in the Metro Pharmacy robbery, or something similar, the CVS Pharmacy robbery evidence would provide context for evidence of the charged crime. But that was not the case here. The CVS Pharmacy robbery was merely evidence of a robbery occurring around the same time, nothing more. Minimizing jury confusion is the most important consideration in determining whether something is intrinsic evidence, not simply when the alleged bad act took place.

We therefore conclude that the district court abused its discretion in admitting the evidence of the CVS Pharmacy robbery. However, we also conclude that this error was harmless. Because the admission of the CVS Pharmacy evidence

constitutes a nonconstitutional error, we review only for whether the evidence, in light of the entire record, (1) substantially influenced the outcome of the trial, or (2) leaves us in grave doubt as to whether it had such an effect. *Kotteakos*, 328 U.S. at 764–65; *Tome*, 61 F.3d at 1455.

In this case, given the breadth and depth of admissible evidence establishing the charged robberies, we cannot say that the admission of the CVS Pharmacy robbery evidence substantially influenced the outcome of the trial. Certainly, the government used the evidence to attempt to establish Vernon's guilt for the global conspiracy count by showing the commonalities between the CVS Pharmacy robbery and the other robberies. But as we have already held above, the government failed to prove the global conspiracy. As such, the CVS Pharmacy evidence had little bearing on the trial's outcome. Further, the admission of the evidence does not leave us in grave doubt as to whether it had such an effect. We are therefore confident that the error was harmless, and we affirm the district court.

## VI. GANG-AFFILIATION EVIDENCE

Vernon also appeals the district court's decision to admit the gang-affiliation evidence, arguing it was irrelevant and unfairly prejudicial. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable. Fed.

R. Evid. 401. Under Rule 403, a trial court may exclude otherwise "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." We "afford[] the district court considerable discretion in performing the Rule 403 balancing test because district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues." *United States v. Archuleta*, 737 F.3d 1287, 1292 (10th Cir. 2013) (quoting *United States v. MacKay*, 715 F.3d 807, 839 (10th Cir. 2013)). We review a district court's evidentiary determinations for an abuse of discretion. *United States v. Flanagan*, 34 F.3d 949, 952–53 (10th Cir. 1994).

Vernon filed a motion in limine to exclude all evidence of his alleged gang-affiliation and any mention that the crimes were gang-related. He argued that the evidence was irrelevant and alternatively that Rule 403 precluded admission of the evidence. The district court denied the motion, concluding that the gang evidence was relevant and that the probative value of the evidence outweighed the danger of unfair prejudice.

At trial, the government introduced evidence that Vernon and some of his other alleged coconspirators were members or affiliates of the Hoover Crips street gang. For instance, Anthony Campbell testified regarding his experience as a member of the Hoover Crips from 1993 to 2003. As discussed already, this was the government's theory of interdependence for the global conspiracy. The Tulsa

Police Department has a system for "certifying" individuals as gang members or affiliates based on a point system. Officer Steven Sanders testified that Vernon had some points, but he did not have enough to be a certified gang member; the Tulsa Police Department considered him only an affiliate of the Hoover Crips. Even so, Herron testified that Vernon was an actual member of the Hoover Crips, specifically the 27 sect. The government used the gang evidence as circumstantial evidence of interdependence between the coconspirators for all of the charged robberies.

On appeal, Vernon makes only the bare assertion that "the government presented irrelevant, prejudicial evidence regarding the Hoover Crips street gang . . . ." Appellant's Br. at 38. The government responds that the gang affiliation evidence was probative to establish an agreement among the defendants, the purpose of the conspiracy, and knowledge by the defendants.

We first conclude that the evidence was relevant. To prove guilt under Count One—that Vernon had conspired with others to rob banks, credit unions, and pharmacies—the government had to show that he agreed with at least one other person to do so. *See Caldwell*, 589 F.3d at 1329. We have previously held that "where conspiracy is charged[,] gang-affiliation testimony may be relevant." *Archuleta*, 737 F.3d at 1293–94 (citing multiple cases where this court has allowed gang-related evidence to prove conspiracy); *see also, e.g.*, *United States*

*v. Brown*, 200 F.3d 700, 708 (10th Cir. 1999) (same). Gang evidence is often relevant to the formation of the conspiracy, the agreement of the coconspirators, the purpose of the conspiracy, and the knowledge attributable to the conspirators. *Robinson*, 978 F.2d at 1562–63. But gang evidence alone cannot support a conviction. *Id.* at 1563. Here, we conclude that the gang evidence was properly admitted because it provided circumstantial evidence that Vernon was involved in forming and agreeing to participate in the global conspiracy and knew its purpose. *See id.* at 1562–63.

Certainly, we concluded above that the evidence at trial established interdependence only for the smaller conspiracies to rob the individual banks or pharmacies. But we must remember that at the time of the district court's ruling, the district court had properly joined the alleged coconspirators' trials, and we review the district court's decision based on the facts then available to it. The probative value of the gang evidence was considerable, given that Vernon disputed interdependence by arguing that the codefendants did not know each other and did not have a joint motive. Therefore, it was probative circumstantial evidence to disprove Vernon's claim. *See, e.g.*, *id.* at 1562 ("Circumstantial evidence is often the strongest evidence of conspiracy."). Even for the individual conspiracies that the government actually proved at trial, this evidence had probative value, just on a smaller scale.

Finally, the danger of unfair prejudice was limited, given that the gang-affiliation evidence was only a small part of the evidence against Vernon. Other direct and circumstantial evidence proved that Vernon helped commit the robberies. For instance, Herron testified that Vernon met with others to plan the Metro Pharmacy robbery, including going into the pharmacy with two others and demanding money and drugs. For the Arvest Bank robbery, the police discovered Vernon emerging from his house shortly after the robbery. The police later found the marked bait bills and the GPS tracker from Arvest Bank inside his house. The evidence showed that Vernon robbed Arvest Bank with two of his brothers, meaning that the jury did not need to rely on the gang-affiliation evidence to find knowledge, purpose, or agreement among the coconspirators. In sum, Vernon's common gang membership with his coconspirators was a small part of the evidence.

We conclude that the district court did not abuse its discretion in admitting the evidence.

## VII. GANG-CERTIFICATION RECORDS

Vernon further argues that the district court's decision to admit his gang-certification record and its underlying hearsay violated the Confrontation Clause. In *Crawford v. Washington*, the Supreme Court held that testimonial

hearsay is barred from admission in a criminal trial unless the witness is unavailable and the opposing party has had an opportunity for cross-examination. 541 U.S. 36, 68 (2004). This court reviews de novo the legal question of whether evidence at trial violates the Confrontation Clause. *United States v. Summers*, 414 F.3d 1287, 1298 (10th Cir. 2005). We review a decision to admit evidence that does not implicate the Constitution for abuse of discretion. *United States v. Dowlin*, 408 F.3d 647, 659 (10th Cir. 2005).

In *Crawford*, the Court left the definition of testimonial "for another day." 541 U.S. at 68. The court did explain:

> Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions" . . . "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," . . . These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

*Id.* at 51–52 (citations omitted).

Since *Crawford*, the Court has still not articulated a clear definition of testimonial statements. Instead, courts have adopted an ad hoc approach for

determining whether evidence is testimonial, and the Supreme Court has specifically carved out numerous exceptions and limitations. *See, e.g.*, *Michigan v. Bryant*, 131 S. Ct. 1143, 1150 (2011) (holding that statements made to police concerning an ongoing emergency are not testimonial); *Davis v. Washington*, 547 U.S. 813, 822 (2006) ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."). We have previously explained that testimonial hearsay "at a minimum, [includes] prior testimony at a preliminary hearing, before a grand jury, at a former trial, and statements made during police interrogations." *United States v. Mendez*, 514 F.3d 1035, 1043 (10th Cir. 2008) (citing *Crawford*, 541 U.S. at 68).

Before trial, the district court found that Officer Sanders was not an expert in gang membership, but it allowed him to testify as a fact witness regarding "the gang culture within the Tulsa area, including the operation, structure and terminology of the gang, based upon his working knowledge of the same. His testimony will, however, be governed by Fed. R. Evid. 701." By the district

court's direction, Officer Sanders could not "give his own personal opinion as to the gang affiliation of any particular person especially where that opinion differs from the official business records maintained by the Gang Task Force." The court also found that Officer Sanders's personal opinions would be substantially more prejudicial than probative under Fed. R. Evid. 403.

At trial, Officer Sanders testified about the Tulsa Police Department's gang-certification system and records. He testified that the police department has a group called the "Tulsa Area Response Gang Enforcement Team," also known as "TARGET." The Tulsa Police Department keeps records to track the membership of various gangs. The gang-certification records indicate whether someone is an affiliate or a member, depending on the number of points allocated based on a predetermined scale. The records also reference other criminal investigations by the police department. Officer Sanders, as a member of TARGET, testified that Vernon's record showed Vernon as an affiliate, not a member, of the Hoover Crips.

The district court admitted Vernon's gang-certification record from the Tulsa Police Department under Fed. R. Evid. 803(6). On appeal, Vernon first argues that the record did not qualify as a business record under Fed. R. Evid. 803(6)

and that it is testimonial hearsay in violation of the Confrontation Clause.[19] He argues second that the admission of the underlying hearsay (i.e., the "points" allocated to a suspected gang member based on the Tulsa Police Department's classification system and the other references in the record) contained within the records violated the Confrontation Clause. Stated differently, Vernon argues for two separate Confrontation Clause violations: (1) the gang-certification record itself; and (2) the references within the record to other police reports discussing the gang activity of Vernon. We discuss each basis for appeal separately below.

## A. Business Records Exception

Vernon waived his argument that the gang-certification record was not admissible as an ordinary business record. At trial, Vernon conceded that the record was an ordinary business record that the police kept, and he did not object to its admission on grounds that it did not qualify for admission under the business records exception. At trial, Vernon's attorney conceded that "[t]he

---

[19] Vernon also argues to us that the actual gang-certification records were "irrelevant pursuant to Fed. R. Evid. 401–404, given that there was no proof the supposed global conspiracy involved the Hoover Crips gang." Appellant's Br. at 42. Earlier in Section VI, we concluded that the gang-affiliation evidence was relevant and probative under Rules 401 and 403. For the same reasons we affirmed the district court in Section VI, we affirm the district court here under Rules 401 and 403. As such, at this juncture, we are considering only whether the gang-certification records that the Tulsa Police Department maintained were incorrectly admitted into evidence under Fed. R. Evid. 803(6) and the Confrontation Clause.

document itself is an ordinary business record that's kept by the gang task force." R. vol. 3, at 1827. Accordingly, to the extent that Vernon now argues that these did not qualify under Fed. R. Evid. 803(6), we deem that argument waived.

Vernon responds that his admissions to the district court "did not invite any error or waive the hearsay objection" because "[s]trictly speaking, the Gang Certification records are a type of business record." Appellant's Reply Br. at 23. This argument is unpersuasive. This case differs from those in which a defendant generally objects on hearsay grounds and later appeals. At the district court, Vernon agreed with the government that the gang-certification record was a business record. The closest Vernon came to objecting to admission of the gang-certification record was when he objected that the gang points allocated to Vernon violated the Confrontation Clause. *See* R. vol. 3, at 1828 ("The points that are attributed by those field interviews are also hearsay and violate[] the confrontation clause.").

Further, Vernon did not ask for plain error review. We have held that an appellant waives an argument if he or she fails to raise it in the district court and later on appeal fails to argue for plain error. *See, e.g.*, *United States v. Burke*, 633

F.3d 984, 987–91 (10th Cir. 2011). We therefore do not consider the merits of Vernon's Fed. R. Evid. 803(6) argument.[20]

## B. The Confrontation Clause

Because Vernon objected generally on Confrontation Clause grounds, we will consider whether the admission of the gang-certification record and its underlying hearsay violated Vernon's Confrontation Clause rights.[21] Two levels of hearsay are at play: (1) the gang-certification record itself; and (2) the hearsay statements within the gang-certification record. Vernon argues only that "[t]he records go to a key element of the government's proof. Admitting the records was harmful and prejudicial as a matter of law."

---

[20] But even if we did consider the merits, any error would be harmless because this evidence was cumulative in light of Herron's testimony that Vernon was a member of the Hoover Crips. We explain this more in depth below.

[21] Vernon did object to the admission of the gang-certification records on the ground that they contained a second level of inadmissible hearsay in violation of the Confrontation Clause, specifically the gang-points allocated and the references to other police reports. R. vol. 3, at 1827–28 ("And under the confrontation clause, those officers that have produced those documents aren't here to be cross-examined, it's completely subjective as to what they saw, what they experienced. That goes into a report that is then referenced by this gang sheet and that's how the points are attributed. The document itself is a business record; however, the field interviews and the reports that are referenced within there are hearsay. The points that are attributed by those filed interviews are also hearsay and violates the confrontation clause."). The government admits that the information underlying the gang-certification records was inadmissible and that the admission of that evidence violated the Confrontation Clause.

The admission of evidence in violation of the Confrontation Clause does not automatically cause prejudice that requires reversal. *See, e.g.*, *Summers*, 414 F.3d at 1303 (concluding that substantial evidence of guilt renders a *Crawford* violation harmless beyond a reasonable doubt). Instead, we must consider (1) whether the challenged evidence is hearsay, (2) whether it is testimonial, and if so, (3) whether its introduction was harmless error beyond a reasonable doubt. *United States v. Chavez*, 481 F.3d 1274, 1277 (10th Cir. 2007) ("Violations of the Confrontation Clause are subject to harmless error analysis . . . under which 'the beneficiary of a constitutional error must prove beyond a reasonable doubt [that] the error complained of did not contribute to the guilty verdict.'") (quoting *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991)); *Mendez*, 514 F.3d at 1043.

> In assessing harmless error, we look to "the context in which the statement was admitted, how it was used at trial, and how it compares to the properly admitted evidence." Several factors are helpful in determining whether a Confrontation Clause violation amounts to harmless error, among them (1) the importance of the witness's testimony in the prosecution's case, (2) the cumulative nature of the testimony, (3) the presence or absence of corroborating or contradictory testimony, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case.

*Chavez*, 481 F.3d at 1277 (internal citations omitted).

First, we assume, without deciding, that the gang-certification record itself was testimonial hearsay. Second, we also assume, without deciding, that the underlying hearsay statements in the gang-certification record were testimonial. The government conceded as much for the underlying hearsay statements. Appellee Br. at 66 ("Vernon's gang certification record contained three references to field interview reports, all of which appear to have been offered for their truth, and were likely to fall into this Court's definition of testimonial hearsay. . . . [T]he information underlying those records was arguably inadmissible hearsay and violated the Confrontation Clause. However, any error in admitting the information underlying Vernon's gang certification was harmless beyond a reasonable doubt."). This leaves us to decide whether introduction of the gang-certification record and the hearsay within it was harmless beyond a reasonable doubt. *See Chavez*, 481 F.3d at 1277; *see also United States v. Torrez-Ortega*, 184 F.3d 1128, 1135 (10th Cir. 1999).

First, the gang-certification record itself was cumulative. *See Chavez*, 481 F.3d at 1277 (reasoning that the cumulative nature and presence of corroborating testimony both weigh in favor of concluding that the error did not affect the guilty verdict). Even if the district court erred in admitting the gang-certification record itself, other admissible evidence in the record established Vernon's gang affiliation for the jury. *See id.* at 1278. As a fellow member of the gang, Herron

testified that Vernon was a member of a particular sect of the Hoover Crips in Tulsa. Thus, any error in admitting the gang-certification record was harmless beyond a reasonable doubt.

Second, the hearsay contained within the gang-certification records was a small part of the government's evidence. The certification record contained three hearsay statements from field interview reports where the police noted that officers had seen Vernon with other members of the Hoover Crips. This record also allocated points to Vernon based on the police's determination of Vernon's purported gang activity. Finally, the report recommended that Vernon be considered a gang affiliate. Given the breadth and depth of the admissible evidence introduced against Vernon, we do not believe that the underlying hearsay contained within the gang-certification record affected the jury's verdict. Instead, considering the totality of evidence against Vernon, we conclude that it was harmless beyond a reasonable doubt.

We accordingly affirm the district court in part and conclude that any error here was harmless beyond a reasonable doubt.

## VIII. CELL PHONE RECORDS

Vernon next appeals the district court's decision to admit cell phone records and police testimony interpreting those records. We review evidentiary

determinations for an abuse of discretion. *United States v. Blechman*, 657 F.3d 1052, 1063 (10th Cir. 2011).

At trial, the government introduced cell phone tower evidence under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6). Matthew Kase, who provides legal compliance services to Cricket Communication, testified at trial and authenticated various phone records. He authenticated records for cell phones belonging to Whitney Landrum, Stanley's girlfriend, for November 4 through November 6, 2011. He also testified about cell phone records for a number subscribed in Vernon's name. He testified about Vernon's phone's activity from August 12 through August 14, 2011; September 3 through September 5, 2011; September 8 through September 17, 2011; and November 4 through November 6, 2011.[22] Kase also testified about records for Duncan Herron's cell phone number for those same periods. Kase further testified about a cell phone number belonging to Lewis, which included activity for July 26 through 27, 2011; August 12 through August 14, 2011; September 3 through September 5, 2011; September 8 through September 17, 2011; November 4

---

[22] These periods generally corresponded with the Metro Pharmacy robbery and the Arvest Bank robbery.

through November 6, 2011; and December 7 through December 11, 2011.[23] In response to a police subpoena, Kase produced all of these records to the police as part of their investigation. Vernon objected at trial that the records were testimonial hearsay, but the district court disagreed and admitted the cell phone records.[24]

For each relevant phone number, Special Agent Andy Kerstetter obtained the "historical call detail records" for that number.[25] According to Agent Kerstetter, those cell phone records identify the number of the calling phone (i.e., incoming or outgoing), the date and time of the call, and the cell tower and cell tower

---

[23] These periods generally corresponded with the Metro Pharmacy robbery, the Tulsa Credit Union robbery, and the Arvest Bank robbery.

[24] Vernon argues that the cell phone tower records (which included the phone numbers called, the time of the call, and the cell tower used to place the call) were testimonial, but he admits that he only makes the argument to preserve this issue for further appeal. This court has previously held that cell phone tower data is admissible under the business records exception and that it is nontestimonial. *United States v. Yeley-Davis*, 632 F.3d 673, 678–81 (10th Cir. 2011). Because Vernon has only raised this argument to preserve the issue and makes no effort to argue the merits, we do not reconsider the issues that we already addressed in *Yeley-Davis*.

[25] Vernon claims that Agent Kerstetter could not testify regarding these matters as a fact witness because he lacked personal knowledge. Vernon does not cite to any point in the record where he raised this argument to the district court, and we will not do an exhaustive search of the record to identify whether Vernon properly preserved this argument. He merely points us to the point in the record where the district court allowed Agent Kerstetter to testify as a fact witness. Even if Vernon properly preserved this argument, it would be unavailing because Agent Kerstetter properly relied on these cell phone records during the course of his investigation.

sector used. For each of the phone numbers, including Vernon's, Agent Kerstetter examined the relevant data. He turned this data into a map that depicted the information collected from the cell phone company.

During a *Daubert* hearing, the district court concluded that Agent Kerstetter could not testify as an expert regarding the cell phone data, but that he could testify as a fact witness about certain findings of his investigation. For instance, the court allowed Agent Kerstetter to present diagrams he had created, depicting the locations of the cell towers and sectors listed in the cell phone records and the locations of the charged robberies. In those diagrams, he chose a relevant timeframe (such as during a robbery), listed a particular phone number, and showed aerial views of each individual location based on the sectors and towers in use. The district court disallowed Agent Kerstetter from providing any opinion about the range of cell towers, the exact location of any particular phone, and who was using the phones at the dates and times listed.

Vernon argues that the district court impermissibly allowed Agent Kerstetter to testify about where certain of the Defendants' phones were located when certain calls were placed.[26] Based on our reading of the record, the district court

---

[26] Vernon also argues that the court did not allow complete cross-examination of Agent Kerstetter, in violation of the Sixth Amendment. He points to no place in the record where he preserved this argument and does not ask for plain error on

allowed Agent Kerstetter to testify only about what tower was in use for a particular call, and he was prohibited from opining about the exact location of a particular phone.

Because Agent Kerstetter testified only about the facts contained within these records, we conclude that his testimony did not run afoul of Fed. R. Evid. 702. We also conclude that his use of diagrams and maps was appropriate under Fed. R. Evid. 1006. Under Rule 1006, witnesses "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs . . . ." *See also, e.g.*, *United States v. Samaniego*, 187 F.3d 1222, 1223–24 (10th Cir. 1999) (requiring admissibility under Fed. R. Evid. 803(6) of telephone records before admitting summary charts of the records under Fed. R. Evid. 1006).[27]

Unlike with Agent Kerstetter, the district court allowed Special Agent Charlie Jones to testify about the location of phones at given times based on the same cell

---

appeal. As such, we do not consider the merits of this argument. *See Burke*, 633 F.3d at 987–91.

[27] Vernon argues that only an expert could create these maps and diagrams. Vernon submits that the "arcs and angles" represented a judgment call and an expert opinion regarding the coverage of each tower. We disagree. After reviewing the maps, we conclude that they were proper summary diagrams from the cell phone records available to Agent Kerstetter. The government cites to multiple places in the record where Agent Kerstetter explained that the coverage areas were "angled at whatever angle is depicted by [the cell phone company] as the cellular provider's tower location and angle of that sector."

phone records. Agent Jones provided his opinion as to where a particular cell phone was located, sometimes even down to the particular street. Vernon argues that Agent Jones's testimony regarding the street location of particular cell phones was expert testimony under Fed. R. Evid. 702 and that because Agent Jones was not qualified as an expert, it was improper opinion testimony. The government responds that Vernon failed to object properly to Agent Jones's testimony at trial, and it argues for plain error review. We conclude that Vernon objected when Agent Jones offered an opinion regarding the cell phone locations, and as such, he properly preserved this issue.

Because the government makes no effort to argue that Agent Jones's testimony was not improper expert testimony, we will assume, without deciding, that the district court should not have permitted him to testify as he did. The government argues only that any error was harmless. "A non-constitutional error is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (quoting *Kotteakos*, 328 U.S. at 765). We do not think that Agent Jones's testimony regarding the location of the cell phones had a substantial influence on the outcome of the jury's verdicts against Vernon.

The trial record reveals abundant evidence establishing Vernon's guilt on each charge.[28] Vernon even admits that "[t]he government used the phone records to corroborate Duncan Herron's account of the Metro Pharmacy robbery," Appellant's Reply Br. at 21, which makes any inadmissible evidence cumulative because the jury had already heard similar evidence. Further, the district court properly admitted some of the cell phone data, including Agent Kerstetter's testimony regarding the numbers called and the cell phone towers used to place those calls, making some of Agent Jones's testimony cumulative.

The jury heard admissible evidence establishing that Devers's phone had called the Metro Pharmacy twice before the robbery, that Devers's phone and Herron's phone had communicated by text message during the robbery, and that Lewis's phone and Vernon's phone had contacted each other by cell phone during the robbery. All of this evidence was relevant and admissible. Herron also testified extensively about Vernon's involvement in planning and executing the Metro Pharmacy robbery. Also, based on the dates and times from the cell phone records during the Arvest Bank robbery (not the location of the phones), the jury could infer that Vernon and Stanley were communicating before the Arvest Bank robbery. The jury also heard the police testify that they followed the GPS tracker,

---

[28] The government did not rely on cell phone evidence to prove the IBC Bank robbery. The government did use cell phone evidence for the Metro Pharmacy robbery and the Arvest Bank robbery.

which led them to Vernon, who had in his home the stolen money from the robbery, the GPS tracker, and one set of the clothes used in the robbery. In light of all of this evidence, the cell phone evidence's importance is minimal for Vernon's convictions.

We affirm the district court in part and conclude that any error from Agent Jones's testimony was harmless.

## IX. EYEWITNESS IDENTIFICATIONS

Vernon appeals the district court's decision to allow the government to introduce eyewitness-identification testimony from the IBC Bank robbery. On the day of the IBC Bank robbery, Ms. DeLeon was working as a teller. A person entered the bank and engaged her with two minutes of face-to-face small talk. He then told her that he had a gun and demanded money. She gave him money from her teller drawer. The robber saw another teller counting money and demanded that money as well.

Two years later, a police officer showed Ms. DeLeon a bank security photograph, which showed the robber standing at her teller window. Not surprisingly, she confirmed that the picture showed the suspect as she remembered him from the day of the robbery. After putting the photograph from the robbery away, the officer then showed Ms. DeLeon a six-person photo-lineup.

Even after he told her that the suspect was not necessarily included in the lineup, she identified Vernon by circling his picture. At trial, Ms. DeLeon identified Vernon in-person as the robber she had encountered at IBC Bank. During the trial, two other witnesses from IBC Bank also identified Vernon in-person as the robber.

Before trial, Vernon filed a motion in limine to exclude all eyewitness-identifications of Vernon from the IBC Bank robbery. Over Vernon's objections, the court admitted the results of the photo lineup and Ms. DeLeon's eyewitness identifications. He argues to us that the identification procedure was unnecessarily suggestive and that the district court should have excluded the photo-identification.

Vernon also argues that the photo-lineup identification "violated F.R.E. 401–03." He asserts that "[i]t is of very limited relevance that Ms. DeLeon thinks that out of six photographed persons selected by the government, Vernon Hill looks the most like the person who is shown in the photo from the robbery itself. Ms. DeLeon's testimony also served to invade the province of the jury, [telling] the jury what factual finding to make." Appellant's Br. at 52.

We identify three distinct arguments from Vernon's appeal on this issue: (1) the photo-lineup identification was irrelevant because Ms. DeLeon was only identifying the person from the photo lineup who best matched the photo from the

day of the robbery; (2) the photo-lineup identification invaded the province of the jury; and (3) the procedure used to obtain the photo-lineup identification was unnecessarily suggestive. We find each unpersuasive.

First, the photo-lineup identification was relevant. We review questions under Fed. R. Evid. 401 for an abuse of discretion. *Flanagan*, 34 F.3d at 952–53. Under Rule 401, something is relevant "if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ms. DeLeon's identification makes it more probable that Vernon robbed the IBC Bank than it would be without her identification. Ms. DeLeon was working the day of the robbery, and she interacted with Vernon before and during the robbery. Her identification of Vernon is relevant because that evidence makes it more likely that Vernon was indeed the bank robber. Whether Ms. DeLeon's identification from the photo array is a good identification goes to weight rather than admissibility. Ms. DeLeon's eyewitness identification in the photo array satisfies Rule 401.

Also, the probative value of this identification was not substantially outweighed by the danger of unfair prejudice under Rule 403. We review a district court's admission of evidence under Rule 403 for an abuse of discretion. *United States v. Cerno*, 529 F.3d 926, 935 (10th Cir. 2008). "In engaging in the requisite balancing, we 'give the evidence its maximum reasonable probative

force and its minimum reasonable prejudicial value.'" *Id.* (quoting *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000)). To tip against admitting the evidence, the risk of unfair prejudice must substantially outweigh the evidence's probative value. *Id.* (citing *United States v. Tan*, 254 F.3d 1204, 1212 (10th Cir. 2001), and *SEC v. Peters*, 978 F.2d 1162, 1171 (10th Cir. 1992)).

We start with the probative value. Police showed Ms. DeLeon a photo taken in the IBC Bank on the day of the robbery and asked whether the person in the picture at her teller window was the person she remembered robbing the bank.[29] This identification occurred nearly two years after the robbery. After looking at the picture, she confirmed that the man in the photograph was the robber. Almost immediately after this, she identified Vernon as the robber from a six-person photo array.[30] Vernon's only argument for unfair prejudice is that "[i]t is of very limited relevance" whether Ms. DeLeon thinks the person from the photograph of the robbery is in the photo array. Yet this is not unfair prejudice: whether Ms. DeLeon's identification from the photo array is a good identification goes to weight rather than admissibility, and the weight of her identification is not at

---

[29] This photo was given to the jury.

[30] The photo-array was provided to the jury.

- 61 -

issue here. We conclude that the district court properly admitted her identification of Vernon under Rule 403.

Second, the identification does not invade the province of the jury. Ms. DeLeon made her identification, and the jury was free to look at the photo array and discredit her testimony. Again, this goes to weight rather than admissibility. We conclude that this did not invade the province of the jury.

Third, Vernon argues that the district court violated his due process rights when it admitted the photo-array identification from Ms. DeLeon. The government argues that the process was not unnecessarily suggestive, that the identification was reliable under the totality of the circumstances, and alternatively, that any error was harmless.

"[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary. . . . Even when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 132 S. Ct. 716, 718 (2012) (internal citations omitted); *see also Grubbs v. Hannigan*, 982 F.2d 1483, 1489–90 (10th Cir. 1993). "[W]e then examine whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (internal quotations omitted) (quoting *Neil v. Biggers*, 409 U.S. 188,

199 (1972)). If a reviewing court concludes that the identification procedure was unnecessarily suggestive and that the identification was not reliable under the totality of the circumstances, it evaluates the erroneous admission under harmless error. *See, e.g.*, *Biggers v. Tennessee*, 390 U.S. 404, 408–09 (1968). This is a mixed question of law and fact that we review de novo. *Archuleta v. Kerby*, 864 F.2d 709, 710–11 (10th Cir. 1989).

We conclude that the photo array shown to Ms. DeLeon was not unnecessarily suggestive. First, contrary to Vernon's argument that the individuals depicted do not look alike, we conclude that the suspects in the photo array are sufficiently similar. Second, the officer did not show Ms. DeLeon a picture of the suspect and tell her to match it to the photo array, although the two identifications occurred within minutes of each other. Instead, he asked her if the man in the photograph from the robbery was the one she remembered coming into the bank. She said he was. She then selected Vernon from the photo array. Even further, the identification has other indicia of reliability. During the robbery, Ms. DeLeon interacted with the robber for two minutes, in a friendly manner, before he attempted to rob the bank.

Finally, any error was harmless beyond a reasonable doubt. Ms. DeLeon identified Vernon in court, based off her interactions with him during the robbery. Any problem with the photo-array lineup is not so severe as to taint this

in-court identification. And importantly, two other eyewitnesses from the IBC Bank robbery identified Vernon at trial as the robber. Vernon does not challenge these identifications on appeal. The in-court identifications are enough to ensure that any error with Ms. DeLeon's testimony was harmless beyond a reasonable doubt.

We affirm the district court.

## X. CUMULATIVE ERROR

Lastly, Vernon argues that he is entitled to a new trial because of cumulative error. Cumulative-error analysis aggregates all actual errors and analyzes whether the cumulative effect on the outcome of the trial was such that the defendant's substantial rights were affected. *Rivera*, 900 F.2d at 1470; *see also United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002). Only actual errors are considered. *Rivera*, 900 F.2d at 1470. Errors are only those violations "of an established legal standard defining a particular error," not just incidents a reviewing court considers troubling. *Id.* at 1471. There must be at least two errors. *Id.* at 1469. If any of the errors aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt in order to affirm. *Toles*, 297 F.3d at 972.

This is a difficult inquiry, and we have explained:

> [T]he constitutional guarantee of a fundamentally fair trial cannot be defined with reference to particularized legal elements, which would limit the discretion of courts to determine whether a trial was fundamentally unfair. Precisely because a fundamental-fairness analysis is not subject to clearly definable legal elements, however, we must approach such analysis with considerable self-restraint. "Courts should tread gingerly when faced with arguments" concerning "the 'fundamental fairness' component of the Fifth Amendment's Due Process Clause," which should be reserved for "the most serious cases, which truly shock the conscience as well as the mind."

*Rivera*, 900 F.2d at 1477 (quoting *United States v. Penn*, 647 F.2d 876, 880 (9th Cir. 1980) (en banc)).

There are multiple errors in this case. Because the two assumed Confrontation Clause errors are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.[31] *Toles*, 297 F.3d at 972. Given the extremely high bar set for cumulative error, we conclude that the errors in this case do not rise to the level such that they "truly shock the conscience as well as the mind." *Rivera*, 900 F.2d at 1477 (quoting *Penn*, 647 F.2d at 880) (internal quotation mark omitted). Even absent the errors, there was overwhelming evidence establishing Vernon's guilt in the commission of the three robberies and in the conspiracy to rob the Metro Pharmacy and the conspiracy to rob Arvest Bank. Vernon does not sufficiently argue that his is a "most serious case[]" that "truly shock[s] the

---

[31] We assumed, without deciding, that there was error under the Confrontation Clause as to the gang-certification records and the underlying hearsay.

conscience as well as the mind." *See id.* In a long and complex trial, the district court erred in making some evidentiary determinations and in determining that the evidence at trial did support the government's allegation that there was a global conspiracy to rob banks, credit unions, and pharmacies throughout Tulsa. Yet these errors together do not rise to the level of a due process violation. We conclude that there is not cumulative error.

## XI. CONCLUSION

We affirm Vernon's convictions as to all counts.

ENTERED FOR THE COURT


Gregory A. Phillips
Circuit Judge

No. 13-5084, *United States v Veronon Hill*

**McHUGH**, Circuit Judge, concurring:

I am pleased to join in the majority's well-reasoned Order and Judgment affirming Vernon's convictions. I write separately to explain why I conclude the variance in this case did not prejudice Vernon's right to a fair trial. As I described in my concurring and dissenting opinion in *United States v. [Dejuan] Hill*, __ F.3d __, No. 13-5074 (10th Cir. May 22, 2015) (McHugh, J. concurring and dissenting), the government's decision to charge and try the defendants for participating in a global conspiracy for which there was insufficient evidence carried with it the risk of prejudicial spillover. But in Vernon's case, the variance did not cause substantial prejudice. The government alleged Vernon participated in four of the seven robberies (specifically, the IBC Bank, CVS Pharmacy (uncharged), Metro Pharmacy, and Arvest Bank). As the majority explains, much of the gang evidence admitted was directly relevant to Vernon's involvement in the conspiracy to rob the Metro Pharmacy. And even if the global conspiracy theory allowed the government to offer some irrelevant and potentially inflammatory evidence related to the Hoover Crips gang or other robberies in which Vernon played no role, the compelling evidence of Vernon's guilt with respect to the Metro Pharmacy and Arvest Bank robberies makes it unlikely the admission of this evidence improperly influenced the jury's verdict. Therefore, I concur in the majority's conclusion that the variance did not interfere with Vernon's right to a fair trial.

I join all other parts of the majority's Order and Judgment in full.