PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MICHAEL JAY HOOD,

      Defendant - Appellant.

No. 13-6182

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:12-CR-00166-D-1)**

---

Rabindranath Ramana, Calvert Law Firm, Oklahoma City, Oklahoma for Defendant-Appellant.

Edward J. Kumiega, Assistant United States Attorney, Oklahoma City, Oklahoma (Sanford C. Coats, United States Attorney, Oklahoma City, Oklahoma, with him on the brief) for Plaintiff-Appellee.

---

Before **MATHESON**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

On March 14, 2012, Oklahoma City Police Detectives Martinez and Lambert and Oklahoma City Police Officer Greason encountered defendant Michael Hood at an apartment complex while investigating a string of burglaries. Greason and Martinez

pursued Hood after residents of the apartment complex alerted them that an individual was running from the apartment the officers believed was associated with the burglaries. When the officers caught up to Hood, his body was turned away from them, and he appeared to be fumbling around for something in his jacket. Concerned that Hood might be armed, the officers withdrew their firearms and ordered Hood to the ground. The officers discovered a firearm in Hood's jacket pocket.

On appeal, Hood primarily argues that the officers violated his Fourth Amendment rights. In addition, he challenges his sentence, arguing that he did not qualify for sentencing under the Armed Career Criminal Act. For the reasons stated herein, we affirm.

## FACTS

**1. The March 14, 2012 Encounter**

On March 14, 2012, Martinez and Lambert were investigating a string of burglaries that had been reported at the 2600 block of Northwest 15th Street in Oklahoma City. At one of the burglarized residences, the police had found a cell phone that they believed belonged to a suspect in the burglary. The phone was registered to Randy Milton, a current renter at an apartment complex located at 2909 Northwest 31st Street—a high-crime area of Oklahoma City.

The detectives went to the apartment complex and learned from the apartment manager that Milton lived in apartment 108. After knocking and identifying themselves, the detectives heard noise coming from inside the apartment, but no one answered the

door. After a few minutes, the detectives walked over to the apartment complex's parking lot to inspect a car identified by apartment residents as belonging to Milton. A check of the car's VIN revealed that it was stolen.

After learning that the car was stolen, Lambert began to inventory the car's contents while Martinez and Greason began to walk back toward the apartment complex. As Greason and Martinez were returning to the complex, a resident shouted to them that someone was running from apartment 108. The officers ran into the complex and found Hood on the other side of a door that was closing.

When Martinez and Greason encountered Hood, he was facing a corner of the building with his back toward them. Although it was an unseasonably warm day, Hood was wearing a winter jacket and making "frantic" motions as though he was trying to remove something from his inside jacket pocket. Martinez believed that Hood might be removing a weapon, so he withdrew his firearm and ordered Hood to get on the ground.

Although Hood partially complied with Martinez's command, he still appeared to be lying atop something with his hands underneath him. Lambert—having heard the commotion—rushed to the scene and saw Hood still grasping for something. Lambert asked Hood if he had a firearm underneath him, and Hood replied, "I don't know." This prompted the detectives to handcuff and frisk Hood. They discovered and seized a 9mm Taurus pistol from the right inside pocket of Hood's jacket.

## 2. Hood's Trial and Sentencing

A grand jury issued an indictment charging Hood with two counts of being a felon in possession in violation of 18 U.S.C. § 922(g)(1). Count One charged Hood with being a

felon in possession of a firearm and related to this incident on March 14, 2012. Count Two charged Hood with being a felon in possession of a component part of ammunition and related to a separate incident that occurred on June 6, 2012.[1] Before trial, Hood filed a motion to suppress the firearm seized from his jacket, arguing that the police had seized it in violation of his Fourth Amendment rights. The district court held an evidentiary hearing on Hood's motion and denied it. Hood also moved to exclude any testimony or evidence about the burglary investigation that led to his arrest. The court also denied this motion. A jury convicted Hood on both counts.

Hood's presentence report ("PSR") revealed his extensive criminal history, including three separate felony convictions that the district court found qualified as predicate offenses (two "serious drug offenses" and one "violent felony") under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). At sentencing, Hood contended that his 1985 Oklahoma state conviction for pointing a firearm at a person should not count as a "violent felony" under the ACCA. The district court disagreed. After concluding that the ACCA's enhanced penalty applied to Hood, the court correspondingly calculated Hood's guideline range as 262 to 327 months' imprisonment under United States Sentencing Guidelines Manual § 4B1.4. It sentenced him to 262 months. Hood appeals.

DISCUSSION

1.  **The Firearm Discovered on March 14, 2012**

---

[1] Count Two related to Hood's participation in a violent altercation that occurred on June 6. Since the circumstances of that altercation are not relevant to our decision here, they are not discussed at length.

Hood argues three points regarding the firearm seized from his front jacket pocket on March 14. Central to all of these arguments is his contention that the officers seized the firearm in violation of his Fourth Amendment rights. Hood first claims that the government failed even to argue in the district court that the officers' use of handcuffs and weapons was justified; he therefore believes the government has waived this argument. Should he fail on that assertion, Hood's second argument is that the officers were unjustified in drawing their firearms and applying handcuffs. Finally, if we accept his argument that the officers seized the firearm in violation of his Fourth Amendment rights, Hood contends that we must also vacate his conviction on Count Two because the prosecutor referred to the firearm seized on March 14 when urging the jury to convict Hood on Count Two, causing the Counts to become inextricably linked in the eyes of the jury.[2]

We are unpersuaded by Hood's waiver argument. In its response to Hood's motion to suppress, the government argued that the officers' seizure and detention of Hood was a justifiable *Terry* stop supported by a reasonable suspicion of criminal activity. This required the government to prove both that the stop was justified at its inception, and that the actions of police during the stop were "reasonably related in scope to the circumstances [that] justified the interference in the first place." *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997) (citation omitted). In resolving the second

---

[2] Hood refers here to the government's use of the evidence in Count One when explaining Count Two to the jury: "[Hood] carried a gun [on March 14] and [on June 6] he shot somebody in the leg. And we're here again not for a shooting case, but all the government has to prove [for Count Two] is did he have ammunition at the time of the incident."

question, we consider whether "the officers' actions were consistent with a *Terry* stop, or if the degree of force used transformed Defendant's seizure into a de facto arrest." *United States v. Mosley*, 743 F.3d 1317, 1328 (10th Cir. 2014). Therefore, in arguing that the stop was a justified *Terry* stop, the government necessarily asserted that the drawing of firearms and use of handcuffs in effecting the stop were reasonable. The government has not waived this argument.

We also affirm the district court's conclusion that the officers' use of force was justified and did not elevate this encounter to an arrest lacking probable cause. Here, again, we consider (1) whether the stop was justified at its inception, and (2) whether the actions of police during the stop were "reasonably related in scope to the circumstances which justified the interference in the first place." *Gallegos*, 114 F.3d at 1028. For the second question, our precedent allows officers to use force during a *Terry* stop "to the extent that such steps are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Mosley*, 743 F.3d at 1328-29 (quoting *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007)) (internal quotation marks omitted). We consider whether the officers' actions were reasonable under an objective standard: "would the facts available to the officer at the *moment of the seizure* [] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Novitsky*, 491 F.3d at 1254 (emphasis added).

Hood claims that the officers' use of force was inappropriate here because they lacked prior, individualized suspicion that he was dangerous. This claim is unavailing. In weighing the officers' actions, we pay "careful attention to the facts and circumstances of

- 6 -

each particular case" and give "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

Here, the officers were investigating a burglary while in a high-crime area of Oklahoma City. Residents of the apartment complex alerted them that a person was running from the apartment, and the officers then pursued the suspect. When the officers found Hood, he was wearing a winter jacket despite its being a warm day. *See United States v. Bull*, 565 F.2d 869, 871 (4th Cir. 1977) (concluding it was reasonable for officers to frisk a suspect based, in part, on the "fact that one of the parties had on a jacket on a warm night . . ."). The officers also saw Hood frantically fumbling in his pockets, which they believed might indicate he was attempting to remove a weapon. *See United States v. Briggs*, 720 F.3d 1281, 1288 n.4 (10th Cir. 2013) (recognizing that suspicious hand movements can give rise to a reasonable belief that the person may be armed).

Under these circumstances, we conclude that the officers were fully justified in drawing their firearms and ordering Hood to the ground. They did so to protect their own safety and maintain the status quo. Further, once Hood failed to fully comply with the officers' instructions and told them he did not know whether he had a firearm in his jacket, the officers were justified in handcuffing and frisking him to determine whether he was armed.

Our decision on this matter obviates the need to consider Hood's argument that the suppression of the firearm seized on March 14 should also result in our vacating his

conviction on Count Two—which, again, relates to an altercation in which Hood was involved on June 6. Because we find that the firearm was properly admitted, the government was also entitled to refer to the firearm while urging the jury to convict Hood on Count Two.

## 2. The Introduction of Evidence Related to the Burglary Investigation

Hood also disputes the district court's decision to allow the government to introduce evidence regarding the burglary investigation that led to Hood's arrest. Hood contends that the district court should have disallowed this evidence under Federal Rule of Evidence 404(b)(1): "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The district court disagreed with Hood's argument and ruled that the evidence was admissible as intrinsic evidence—evidence "inextricably intertwined with the charged crime such that a witness's testimony would have been confusing and incomplete without mention of the prior act," *United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir. 1994) (quoting *United States v. Record*, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989)) (internal quotation marks omitted)—and therefore not subject to Federal Rule of Evidence 404(b). We review a district court's decision to admit evidence for an abuse of discretion and will "reverse a decision only if it is manifestly erroneous." *United States v. Irving*, 665 F.3d 1184, 1210 (10th Cir. 2011) (quoting *United States v. McPhilomy*, 270 F.3d 1302, 1312 (10th Cir. 2001)) (internal quotation marks omitted).

We again affirm the district court's ruling. We have repeatedly upheld the government's use of evidence of wrongful, uncharged acts necessary to contextualize the

defendant's arrest as intrinsic evidence not subject to Federal Rule of Evidence 404(b). *See, e.g.*, *id.* at 1212–13; *United States v. Ford*, 613 F.3d 1263, 1267–68 (10th Cir. 2010). Hood has not provided us with any adequate basis to depart from these holdings. Here, evidence of the burglary investigation helped to explain both why the officers were at the apartment complex and why they would have been on heightened alert. It also provided important context for the testimony of several of the government's other witnesses.

But even relevant intrinsic evidence must still satisfy the requirements of Federal Rule of Evidence 403: a district judge may exclude it "if its probative value is substantially outweighed by a danger of . . . *unfair* prejudice." Fed. R. Evid. 403 (emphasis added). Here, the evidence admitted about the burglary investigation was not unfairly prejudicial. Notably, it never suggested Hood was a suspect in the earlier burglary. The evidence explained why officers were looking for Milton at the apartment complex. The probative value of the evidence outweighed any possible prejudice from its admission.

### 3. Hood's Sentencing

Finally, Hood contests his sentence imposed under the mandatory enhanced penalties of the ACCA, which apply when a defendant has at least three prior convictions for a "serious drug offense" or a "violent felony." 18 U.S.C. § 924(e)(1). The district court concluded that Hood's 1985 Oklahoma felony conviction for pointing a firearm at a person qualified as a violent felony. Hood does not believe this offense should have been considered a "violent felony" for the purposes of the ACCA.

The first issue here is the parties' disagreement over what standard of review should guide our inquiry. Ordinarily, we review *de novo* whether a defendant's prior conviction

qualifies as a "violent felony" for the purposes of the ACCA. *United States v. Ramon Silva*, 608 F.3d 663, 665 (10th Cir. 2010). But when on appeal a defendant objects to an ACCA enhancement on grounds different from those presented in the trial court, we traditionally review only for plain error. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (applying plain-error review to a sentencing determination when defendant did not raise his argument below). The parties' dispute over the correct standard here hinges on a factual disagreement over the manner in which the district court dealt with Hood's argument regarding the ACCA enhancement.

We need not resolve the parties' dispute, however, because we would affirm the district court's ruling even if our review were *de novo*. Under the ACCA, "the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year . . . [that] has as an element the use, attempted use, or threatened use of physical force against the person of another . . . ." 18 U.S.C. § 924(e)(2)(B)(i).[3] The Supreme Court has told us that physical force in this context means "*violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original). When a statute of conviction contains alternative elements—some of which do not require the threatened use of physical force—we use a modified categorical approach to consider whether the crime to which

---

[3] We note that the ACCA also has a residual clause, which includes within the definition of a "violent felony" any crime that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). Although no reason is apparent on the record, we see that in the district court the government disclaimed any reliance on the residual clause to establish any of Hood's prior felonies as "violent felonies" under the ACCA.

the defendant pleaded guilty is a "violent felony." *Silva*, 608 F.3d at 669. When a modified categorical approach is appropriate, we may "consult charging documents and documents of conviction to determine whether the defendant in a particular case was convicted of an offense that qualifies as a violent felony." *Id.* (quoting *United States v. Hernandez*, 568 F.3d 827, 829 (10th Cir. 2009)) (internal quotation marks omitted).

Here, both parties believe that a modified categorical approach applies, and we agree. In 1985, Hood pleaded guilty to pointing a firearm at another in violation of Okla. Stat. tit. 21, § 1289.16, which provides as follows:

> It shall be unlawful for any person to willfully or without lawful cause point a shotgun, rifle or pistol, or any deadly weapon, whether loaded or not, at any person or persons for the purpose of threatening or with the intention of discharging the firearm or with any malice or for any purpose of injuring, either through physical injury or mental or emotional intimidation or for purposes of whimsy, humor or prank, or in anger or otherwise . . . .

Since this statute contains some alternative elements that would not require a threatened use of physical force, the modified categorical approach requires that we look to additional charging documents to determine the specific crime to which Hood pleaded guilty. Hood pleaded guilty to an Information that stated:

> On or about the 25th day of February, 1984, A.D., the crime of pointing a firearm at another was feloniously committed in Oklahoma County, Oklahoma, by Michael J. Hood, who willfully, knowingly, and without lawful cause, pointed a .45 caliber ACP at Richard Singleton, for the purpose of threatening and intimidating him and with the malicious and felonious intent to injure Richard Singleton either physically or by mental

and emotional intimidation, contrary to the provisions of Section 1289.16 of Title 21 of the Oklahoma Statute . . . . [4]

The parties dispute the meaning of this guilty plea under Oklahoma law, arguing about whether, by pleading, Hood admitted committing all of the alternative elements listed or merely some of them.

We need not decide that question. Here, we know that Hood committed the crime in at least one of the two ways listed in the Information. If both ways qualify as a "violent felony," Hood necessarily committed a violent felony. The Information indisputably charged Hood with pointing a firearm "for the purpose of threatening and intimidating [Singleton]," regardless of what injury Hood intended to inflict. This is because the plain language of the Information admits of two possibilities: (1) Hood willfully, knowingly, and without lawful cause pointed a .45 caliber ACP at Richard Singleton for the purpose of threatening and intimidating him and with the malicious and felonious intent to injure Richard Singleton physically; or (2) Hood willfully, knowingly, and without lawful cause pointed a .45 caliber ACP at Richard Singleton for the purpose of threatening and intimidating him and with the malicious and felonious intent to injure Richard Singleton by mental and emotional intimidation.

Since both charges contain the words "for the purpose of threatening and intimidating him," either method of committing the crime listed in the Information to which Hood

---

[4] Oddly, the Information stated an additional element not required by the statute. Although the statute criminalizes pointing a violent weapon "for the purpose of threatening *or* with the intention of discharging the firearm *or* with any malice," Okla. Stat. tit. 21, § 1289.16 (emphasis added), the Information charged Hood with pointing a ".45 caliber ACP at Richard Singleton, for the purpose of threatening and intimidating him *and* with the malicious and felonious intent to injure Richard Singleton . . . ."

pleaded guilty is a "violent felony" under the ACCA. Using a firearm to threaten another is precisely the kind of threatened "violent force" that the Supreme Court has told us the ACCA proscribes. *See Johnson*, 559 U.S. at 140 (defining violent force as "force capable of causing physical pain or injury to another person"). So long as Hood's crime of conviction necessarily required proof that he had pointed a firearm *in a threatening manner*, we need not concern ourselves with what injury Hood intended to inflict. *See United States v. Herron*, 432 F.3d 1127, 1138 (10th Cir. 2005) (noting that "[k]nowingly placing someone in fear . . . by the use of a deadly weapon certainly constitutes threatening someone" for the purposes of the ACCA); *United States v. King*, 673 F.3d 274, 278, 279–80 (4th Cir. 2012) (finding a South Carolina statute that made it "unlawful for a person to present or point at another person a loaded or unloaded firearm" constituted a violent felony under the ACCA because the South Carolina Supreme Court required that the government prove that the firearm was pointed in a threatening manner as an element of a conviction under the statute).

Having determined that Hood's sentence was appropriate under United States Sentencing Guidelines Manual § 4B1.4, we no longer need to resolve his claim that the district court erred by imposing four additional offense levels under § 2K2.1(b)(6)(B) for his having "used or possessed any firearm or ammunition in connection with another felony offense . . . ." As prescribed by § 1B1.1(a)(6), the PSR properly leapt past § 2K2.1 to § 4B1.4 upon concluding that Hood had three qualifying felonies subjecting him to an enhanced sentence under the ACCA. Because the adjusted offense level under § 4B1.4 (level 34) is higher than under § 2K2.1, even with the four levels added under paragraph

(b)(6)(B) (level 30), it trumps the firearms guideline and renders Hood's argument about the four offense levels moot.

CONCLUSION

For the reasons stated herein, we affirm the district court's judgment.