**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

PHILLIP LAMONT MORGAN,

     Defendant - Appellant.

No. 16-5015

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:13-CR-00218-JHP-1)**
_____

Submitted on the briefs:

Julia L. O'Connell, Federal Public Defender, and Barry L. Derryberry, Research and
Writing Specialist, Office of the Federal Public Defender, Northern District of Oklahoma,
Tulsa, Oklahoma, for Defendant-Appellant.

Danny C. Williams, Sr., United States Attorney, and Neal C. Hong, Assistant United
States Attorney, Northern District of Oklahoma, Tulsa, Oklahoma, for Plaintiff-Appellee.
_____

Before **BRISCOE**, **MATHESON**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.[*]

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument.

_____

The Fourth Amendment protects the people against unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop is a seizure but is "reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). After a lawful traffic stop, an officer has authority to order the driver and passengers from the car. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997). Here, we consider whether an officer has authority to order a person to step off his bicycle after a lawful traffic stop. Under the circumstances of this case, we hold that the officer had that authority.

## BACKGROUND

On September 28, 2013 at about 10:30 p.m., Officer Brent Barnhart was patrolling a high-crime area in Tulsa, Oklahoma, when he saw a man riding a bicycle against traffic and not using a bicycle headlight, in violation of Tulsa's traffic law.[1] Unknown to Officer Barnhart, the bicyclist was Phillip Lamont Morgan, who had a string of felony convictions: (1) unlawful possession of a firearm and ammunition, (2) accessory after the fact to first-degree murder, (3) unlawful possession of a controlled drug, and (4) unlawful possession with intent to distribute a controlled drug.

---

[1] *See* Tulsa Revised Traffic Code, tit. 37, § 1003(A) ("Every person operating a bicycle . . . upon a roadway . . . shall ride as close as is safe to the right-hand curb or edge . . . ."); Tulsa Revised Traffic Code, tit. 37, § 1010 ("Every bicycle . . . or person operating a bicycle . . . which is used at night shall be equipped with a lamp on the front which shall emit a white light . . . to be visible from a distance of at least five hundred (500) feet to the front . . . .").

Upon approaching Morgan, Officer Barnhart saw him "making movements towards his pant pockets." R. Vol. 2 at 44. Officer Barnhart told Morgan to keep his hands out of his pockets. Then Officer Barnhart asked Morgan for identification. Morgan replied that he had done nothing wrong and had no identification. Officer Barnhart asked for Morgan's personal identifiers, and Morgan gave a name (Stanford Wallace), a birthdate, and a social security number. Before returning to his patrol car to run Morgan's personal identifiers through databases, Officer Barnhart again told Morgan to keep his hands outside his pockets.

After Officer Barnhart ran the name Stanford Wallace, the birthdate, and the social security number through the databases, he received back a "no result" response, which led him to suspect that Morgan had lied about his identity. *Id.* at 23. A "no result" response means that no match exists for the information entered. *Id.* In contrast, a "negative result" response means that a traceable record exists (such as an ID card or a driver's license) and that the suspect had no outstanding warrants or criminal history.

From the outset, Officer Barnhart believed that Morgan was acting evasively. In particular, he noted that as Morgan sat on his bicycle, he kept his head and body straight forward, not making eye contact. Based on the way Morgan kept moving his head back and forth, Officer Barnhart feared that Morgan might flee. Based on all he had seen and heard, Officer Barnhart believed that Morgan was trying "to hide criminal activity." *Id.* at 23–24.

3

After Morgan's information produced no results, Officer Barnhart called for backup, reapproached Morgan, and asked him to step off his bicycle. After Morgan refused, Officer Barnhart warned him that "if he didn't step off the bicycle, . . . he would be tased." *Id.* at 25. Morgan responded that "he had been tased before and he was currently in a lawsuit with the City of Tulsa over that incident." *Id.* This strengthened Officer Barnhart's suspicion that Morgan had provided false information, because he believed that the record check would have revealed this earlier incident.

Officer Barnhart's backups arrived quickly. Officer Barnhart told Morgan to step off his bicycle, and again, Morgan refused. But this time, Morgan reached toward and inside his left front pants pocket. Officer Barnhart immediately grabbed Morgan's left arm, fearing that Morgan might grab a concealed weapon. In trying to control Morgan's hands, Officer Barnhart and other officers forced Morgan to the ground. Once on the ground, Morgan planted his arms under his stomach, preventing the officers from handcuffing him. After Morgan ignored the officers' commands to show his hands, an officer tasered him, enabling the officers to handcuff him.

After the officers handcuffed Morgan, Officer Barnhart frisked him for weapons and found a loaded .38-caliber revolver in Morgan's left front pants pocket. Officers transported Morgan to the station, where they identified him by his fingerprints as Phillip Lamont Morgan.

A grand jury sitting in the Northern District of Oklahoma returned an indictment charging Morgan with being a felon in possession of a firearm and

4

ammunition, in violation of 18 U.S.C. § 922(g)(1). Before trial, Morgan moved to suppress evidence of the firearm, arguing that Officer Barnhart had exceeded the scope of the traffic stop by ordering him off his bicycle and by taking him to the ground and tasering him. After a hearing, a magistrate judge recommended denying Morgan's suppression motion. Over Morgan's objections, the district court adopted the magistrate's recommendation.

A jury convicted Morgan of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). The district court sentenced Morgan to twenty-seven months' imprisonment. Morgan now appeals the denial of his motion to suppress.

## DISCUSSION

When reviewing a denial of a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous, and we view the evidence in the light most favorable to the government. *United States v. Trestyn*, 646 F.3d 732, 741 (10th Cir. 2011). "[T]he ultimate determination of the reasonableness of a search and seizure under the Fourth Amendment is a question of law reviewed de novo." *Id.*

"Although traffic stops are often brief, they are nonetheless 'seizures' within the meaning of the Fourth Amendment." *United States v. White*, 584 F.3d 935, 945 (10th Cir. 2009). But because a routine traffic stop is more analogous to an investigative detention than a custodial arrest, such stops are analyzed under the standards announced for investigative detentions in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005). Under these

5

standards, we first ask whether Officer Barnhart's actions were "justified at . . . inception." *Id.* (quoting *Terry*, 392 U.S. at 20) (internal quotation marks omitted). Second, we consider whether Officer Barnhart's actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry*, 392 U.S. at 20) (internal quotation marks omitted).

Here, the traffic stop was justified at its inception. "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). And Morgan doesn't dispute that Officer Barnhart saw him violate Tulsa's traffic laws by riding his bicycle against traffic and failing to use a headlight in the dark.

This leaves Morgan the second part of the analysis. Morgan argues that the officers exceeded the scope of the stop by doing more than issuing a citation and checking for outstanding arrest warrants. In particular, he complains that the officers ordered him to get off his bicycle and ended up taking him to the ground and then tasering him. For the reasons given below, we hold that the officers acted reasonably under the Fourth Amendment.

## A

Morgan concedes that in an ordinary traffic stop, officers may issue a citation, request a driver's license, and determine whether outstanding warrants exist. But because Oklahoma law does not require Morgan to have a driver's license to ride his bicycle, Morgan argues that Officer Barnhart could not ask to see identification. From this, Morgan claims that Officer Barnhart exceeded the permissible scope of the traffic stop, which, he says, is limited to issuing a citation and running a background check. He contends that Officer Barnhart exceeded the permissible scope of the stop by asking for identification and by ordering him to get off his bicycle. We disagree.

First, Officer Barnhart's request for identification didn't exceed the scope of the traffic stop. *See United States v. Rice*, 483 F.3d 1079, 1083–84 (10th Cir. 2007). Courts have long recognized that "questions concerning a suspect's identity are a routine and accepted part" of police investigations. *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 186 (2004). "Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." *Id.* Thus, as part of the lawful stop, the Fourth Amendment authorized Officer Barnhart to determine Morgan's identity, to run a background check, and to issue a citation.

Here, Morgan doesn't dispute that Officer Barnhart could detain him as long as necessary to write a citation and run a background check. But to do so, Officer Barnhart needed to determine Morgan's identity. When Morgan gave a false name, he

7

delayed the officer's ability to learn his true identity. In that situation, Officer Barnhart could not immediately write a citation and complete the stop. Thus, Morgan himself extended the stop. Officer Barnhart didn't exceed its scope by trying to determine Morgan's identity.

Second, Morgan argues that Officer Barnhart exceeded the scope of the traffic stop by ordering him to get off his bicycle. At the outset, we note one significant difference between Morgan and the defendants in the cases he cites. In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) and *Wilson,* the defendants complied with the officers' orders to get out of the car, resulting in an incremental increase in their seizures. In contrast, Morgan disobeyed Officer Barnhart's order to get off his bicycle. Morgan cites no cases concluding that officers violate the Fourth Amendment during an otherwise-lawful seizure when they order a suspect to do something, and the suspect does not comply.

Further, even had Morgan complied and stepped off his bicycle, he still could not show that Officer Barnhart violated his Fourth Amendment rights. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Mimms*, 434 U.S. at 108–09 (quoting *Terry*, 392 U.S. at 19). Reasonableness depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id*. (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). In *Mimms*, the Supreme Court held that a police officer may, as a matter of course,

8

order a driver of a lawfully stopped car to get out of it. *Id.* at 111. The Court explained that this additional intrusion is "*de minimis*" because "[t]he driver is being asked to expose to view very little more of his person than is already exposed." *Id.* In *Wilson*, the Supreme Court extended *Mimms* to passengers in lawfully stopped automobiles. 519 U.S. at 410.

Here, we see little difference between Officer Barnhart's ordering Morgan off his bicycle and an officer's asking a driver to step out of an automobile. In fact, in our view, stepping off a bicycle is less intrusive than stepping out of a car. Morgan argues that Officer Barnhart was unjustified in ordering him off the bicycle because Officer Barnhart could already see him. But consistent with *Mimms*, Officer Barnhart's ordering Morgan off his bicycle was "at most a mere inconvenience." *Id*. And we conclude that public-interest concerns outweighed any personal-liberty intrusion or inconvenience. After all, Officer Barnhart had reason to believe Morgan posed a flight risk on his bicycle. We cannot fault the police for trying to minimize flight risks and the safety concerns that flight and pursuit would entail. Thus, we conclude that after lawfully stopping Morgan, Officer Barnhart did not violate the Fourth Amendment by ordering him to get off the bicycle.

Next, Morgan argues that the officers exceeded the scope of the stop by grabbing him, forcing him to the ground, and tasering him. Morgan argues that these acts transformed his seizure into an arrest without probable cause. But after making lawful stops, officers can use force "to the extent that 'such steps are reasonably necessary to protect their personal safety and to maintain the status quo.'" *United*

*States v. Mosley*, 743 F.3d 1317, 1328–29 (10th Cir. 2014) (quoting *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007)). In view of the circumstances, once Morgan disobeyed earlier commands and reached inside his left front pants pocket, the officers acted reasonably to protect their personal safety. In analyzing whether the officers acted reasonably, we apply an objective standard and ask whether "the facts available to the officer at the moment of the seizure . . . '[would] warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030–31 (10th Cir. 1997) (quoting *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996)). If so, officers may protect their safety with appropriate force, including "drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground." *Mosley*, 743 F.3d at 1329 (quoting *Novitsky*, 491 F.3d at 1254) (internal quotation marks omitted).

In *United States v. Hood*, 774 F.3d 638 (10th Cir. 2014),[2] we rejected a defendant's argument that a stop became an arrest without probable cause when officers handcuffed and frisked him. *Id.* at 642–43. Officers encountered Hood at an apartment complex while they were investigating a string of burglaries. *Id.* at 641. As the officers walked back toward the apartment complex from the parking lot, a resident shouted to them that someone, later identified as Hood, was running from the apartment they were investigating. *Id.* Officers chased Hood until they found him in the complex. *Id.* Though it was unseasonably warm, Hood was wearing a winter

---

[2] Though we overruled a separate holding in *Hood* in *United States v. Titties*, __ F.3d __, 2017 WL 1102867 (10th Cir. 2017), *Hood* remains in force for the proposition cited.

jacket. *Id.* As Hood frantically fumbled for something in his jacket, the officers drew their firearms and ordered him to the ground. *Id.* Once lying on the ground, Hood appeared to be grasping for something beneath him. *Id.* The officers handcuffed and frisked him. *Id.* During the frisk, they found a 9mm pistol in his jacket pocket. *Id.* at 641–42. Like Morgan, Hood sought to suppress evidence of the firearm, arguing that by ordering him to the ground, the officers exceeded the scope of the stop and transformed the stop into an arrest without probable cause. *Id.* at 642.

We rejected Hood's argument after concluding that safety concerns fully justified the officers in drawing their firearms, ordering Hood to the ground, and handcuffing and frisking him to protect their safety. *Id.* at 643–44. Here, Officer Barnhart stopped Morgan in a high-crime area. When asked to get off his bicycle, Morgan refused twice. And despite Officer Barnhart's orders to keep his hands out of his pockets, Morgan reached inside his left front pants pocket. These actions reasonably caused the officers to believe he might be reaching for a weapon.

Under these circumstances, and consistent with *Hood*, we conclude that the officers were justified in physically forcing Morgan to the ground to protect their own safety. And once Morgan refused to comply with the officers' orders to remove his hands from beneath him, the officers were justified in tasering Morgan to handcuff him. Thus, the district court did not err in denying Morgan's motion to suppress evidence of the firearm.

**CONCLUSION**

For these reasons, we affirm the district court's denial of Morgan's motion to suppress.