**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 2, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CHRISTOPHER A. REYNOLDS,

    Defendant - Appellant.

No. 17-3145
(D.C. No. 6:15-CR-10093-EFM-1)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ**, **McKAY**, and **KELLY**, Circuit Judges.
_____

    Christopher A. Reynolds entered a conditional guilty plea to possessing an

unregistered firearm, 26 U.S.C. § 5861(d), preserving his right to appeal the district

court's refusal to suppress evidence obtained during a traffic stop. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

I

    Shortly after midnight on November 20, 2010, Wichita Police Officers Kevin

Dykstra and Matthew Balthazor were on patrol in a convenience-store parking lot.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

Officer Dykstra observed a grey Nissan Altima enter the lot. He recognized the Altima from a narcotics investigation involving an individual named James Wheeler, and as the Altima drove by, he observed the male driver "hunched down in the seat" look away. Aplt. App. at 113. Officer Dykstra ran the Altima's license-plate number and confirmed it was the vehicle involved in the Wheeler investigation. When Officer Dykstra pointed out the Altima to Officer Balthazor, he, too, recognized it from a methamphetamine and firearms investigation implicating Wheeler, so the officers "set up surveillance on the vehicle," *id.* at 115.

The male driver of the Altima stopped at the fuel pumps and appeared to fill the gas tank. As he stood outside the car, the officers drove past and observed him speaking with two female passengers inside the car, keeping his back toward the officers. When the Altima left the convenience store, the officers followed until the Altima pulled into a private driveway. The officers drove past, turned around, and waited as the Altima remained stopped in the driveway. Although it was dark, the officers observed what appeared to be people walk behind the car. They then saw the Altima back out of the driveway and proceed in the opposite direction from which it had come. The officers resumed their pursuit and soon initiated a traffic stop because the driver of the Altima failed to use a turn signal within 100 feet of making a turn, as required by ordinance.

Officer Dykstra, who had been driving the police cruiser, called-in the stop to dispatch. Meanwhile, Officer Balthazor approached the Altima on the passenger side. He observed that the male occupant had moved to the rear passenger seat and

2

one of the female occupants had moved to the driver's seat. When Officer Balthazor asked the driver for her license and proof of insurance, the female passenger replied that neither she nor the driver had a license. During this time, Officer Balthazor was scanning the vehicle for "officer safety" and observed that the male passenger in the back seat "was slouched down and . . . avoiding eye contact." *Id.* at 148. Officer Balthazor asked him for his license because he had been driving, but the man replied that he did not have a license. At that point, Officer Balthazor asked him to step out of the vehicle.

Rather than exit the car, however, the man immediately leaned forward and thrust his hands down to the floorboards near his right leg. Officer Balthazor drew his gun and ordered the man to show his hands, fearing he might be reaching for a weapon or hiding contraband. Officer Dykstra drew his weapon as well, but the man continued to lean forward and said something to the female passenger in the front seat. Officer Balthazor repeatedly told the man to show his hands and to get out of the car, and after approximately ten seconds, the man finally complied.

Once the man was out of the car, Officer Balthazor handcuffed him, patted him down, and placed him in the back of his patrol vehicle. When asked for his name, the man falsely identified himself as "Christopher A. Welliever." *Id.* at 151. Officer Balthazor attempted a record check, but the Wichita Police Department could not identify anyone under that name. Consequently, Officer Balthazor asked the female passenger in the front for the man's name, but she knew him only as "Slim." *Id.* at 152. Officer Balthazor then asked the man for his name a second time, and again he

3

falsely identified himself, although this time he used a different spelling, "Welliver." *Id.* at 152-53. Officer Balthazor attempted a second record check to no avail. The man then volunteered that he had information relating to two homicides involving James Wheeler—the individual implicated in the narcotics and firearms investigation. Officer Balthazor *Mirandized* the man, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and, after conferring with other officers, told him he could not discuss anything relating to the alleged homicides until he knew the man's true identity. The man then identified himself as "Christopher Reynolds." Aplt. App. at 155. Twenty-five minutes elapsed from the beginning of the stop until Mr. Reynolds was *Mirandized*.

Meanwhile, Officer Dykstra had removed the female occupants from the car. At some point, he looked into the rear passenger seat where Mr. Reynolds had been sitting. The car door had been left open when Mr. Reynolds exited the vehicle, and on the floorboard, protruding out from under the seat, was a plastic baggie containing a white crystalline substance that Officer Dykstra believed was methamphetamine. He retrieved the bag and found a second baggie containing the same white crystalline substance. He also saw that the driver's side rear seat-back was down, allowing him to see into the trunk, where he observed the broken-off buttstock of a shotgun. He opened the trunk and recovered a sawed-off shotgun and a second shotgun.

Mr. Reynolds initially denied knowing there were guns or drugs in the Altima, but eventually he admitted knowing that firearms were commonly inside the car. He explained that Wheeler was his roommate, and he helped Wheeler move the firearms from their house to the car. Based on these statements and the evidence recovered

4

from the car, Mr. Reynolds was arrested and transported for questioning by homicide detectives.

Mr. Reynolds was indicted on two counts of possessing an unregistered firearm. Before trial, he filed two motions to suppress, one seeking to suppress his statements—particularly his statement that he had touched the firearms—and a second motion seeking to suppress the drugs and firearms found in the Altima. After a hearing, the district court denied the motions, and Mr. Reynolds entered a conditional guilty plea on one count, *see* Fed. R. Crim. P. 11(a)(2), preserving his right to appeal the suppression ruling. He was sentenced to 51 months in prison.

## II

"In reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Ladeaux*, 454 F.3d 1107, 1110 (10th Cir. 2006) (internal quotation marks omitted).

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "A temporary investigative detention, such as a traffic stop, constitutes a seizure of persons within the meaning of the Fourth Amendment." *United States v. Windom*, 863 F.3d 1322, 1327 (10th Cir. 2017) (brackets and internal quotation marks omitted), *pet. for cert. docketed*, No. 17-7277 (U.S. Jan. 4, 2018). We analyze investigative detentions under the standards set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Morgan*, 855 F.3d 1122, 1125 (10th Cir. 2017).

5

Under those standards, we evaluate, first, whether the investigative detention was "'justified at [its] inception'" and, second, whether the officers' actions "were 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 20).

Mr. Reynolds does not challenge the legal justification for the traffic stop. *See* Aplt. Br. at 7, 11 ("Mr. Reynolds is not challenging the purpose of the stop."). He focuses instead on *Terry*'s second prong, claiming the officers exceeded the scope of the stop when they ordered him out of the car and detained him for twenty-five minutes before *Mirandizing* him. We consider these issues independently.

   *A. Order to Exit the Car*

Mr. Reynolds contends Officer Balthazor exceeded the scope of the stop when he initially asked him to step out of the Altima. He says Officer Balthazor merely believed "he was trying to avoid detection," Aplt. App. at 170, without a reasonable suspicion of criminal activity to justify ordering him out of the car. But police may remove passengers from a car during a lawful traffic stop for officer-safety concerns. *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *Ladeaux*, 454 F.3d at 1110 ("[T]he Supreme Court established a bright-line rule that, during a lawful traffic stop, officers may order passengers out of the car as a matter of officer safety."). This authority exists "even in the absence of any particularized suspicion of personal danger." *United States v. Holt*, 264 F.3d 1215, 1222 (10th Cir. 2001) (en banc), *abrogated on other grounds as recognized by United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007).

6

Officer Balthazor knew the Altima was involved in a narcotics and firearms investigation, he knew Mr. Reynolds had been driving without a license, and he knew Mr. Reynolds continued to look down and avoid eye-contact. This behavior caused Officer Balthazor "heightened concern," Aplt. App. at 148, and thus, he ordered Mr. Reynolds to exit the car. Given that Officer Balthazor was authorized to remove Mr. Reynolds from the car without any particularized suspicion of personal danger, there was no Fourth Amendment violation resulting from his directive to exit the car.[1]

### B. Twenty-Five Minute Detention

Mr. Reynolds also contends the officers unreasonably extended the stop by detaining him for twenty-five minutes before *Mirandizing* him. He says the duration of his detention warrants the suppression of any inculpatory evidence. We disagree.

This court has held that

> [a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

*United States v. Shareef*, 100 F.3d 1491, 1501 (10th Cir. 1996) (internal quotation marks omitted). "While a traffic stop is ongoing, however, an officer has wide discretion to take reasonable precautions to protect his safety," including "ask[ing]

---

[1] To the extent Mr. Reynolds references the officers' actions once he thrust his hands down towards the floorboards, the officers were clearly authorized to remove him from the vehicle at that point for safety purposes.

7

for identification from passengers and run[ning] background checks on them . . . ." *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007). Indeed, "questions concerning a suspect's identity are a routine and accepted part of police investigations" because "[k]nowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." *Morgan*, 855 F.3d at 1126 (internal quotation marks omitted). "When a defendant's own conduct contributes to a delay, he or she may not complain that the resulting delay is unreasonable." *Shareef*, 100 F.3d at 1501.

Here, Mr. Reynolds caused the delay because he attempted to conceal his true identity. He twice gave Officer Balthazor false names, requiring the officer to run two record checks, both of which were inconclusive. His efforts to conceal his identity also compelled Officer Balthazor to ask the female passenger for his name, although that, too, was unhelpful. It was not until after Mr. Reynolds offered information concerning two homicides that he gave his real name, and even then he did so only after Officer Balthazor read him his *Miranda* warnings, conferred with other officers, and declined Mr. Reynolds' offer of information until he gave his true identity. Under these circumstances, Officer Balthazor cannot be faulted for detaining Mr. Reynolds long enough to determine his identity.

III

The judgment of the district court is affirmed.

Entered for the Court
Monroe G. McKay
Circuit Judge

8